## THE VESTRIS.

### In re LIVERPOOL, BRAZIL & RIVER PLATE STEAM NAV. CO., Limited, et al.

District Court, S. D. New York.
May 24, 1932.

See, also, 49 F.(2d) 947; 53 F.(2d) 847.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (by Van Vechten Vedder, Chauncey I. Clark, Paul Fearson Shortridge, Stanley R. Wright, and Norman M. Barron, all of New York City), for petitioner.

Bigham, Englar, Jones & Houston, of New York City (by D. Roger Englar, Oscar R. Houston, W. J. Nunnally, Jr., Ezra G. Benedict Fox, and Francis C. Reed, all of New York City), for certain claimants.

Hunt, Hill & Betts, of New York City (by George Whitefield Betts, Jr., George C. Sprague, and Joseph A. McDonald, all of New York City), for Frederick F. Brown and others.

George Z. Medalie, U. S. Atty., and Charles E. Wythe, both of New York City.

Haight, Smith, Griffin & Deming, of New York City (by Arnold W. Knauth, of New York City), for Elvira F. Rua.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (by Charles R. Hickox and Clement C. Rinehart, both of New York City), for West India Oil Co., H. C. Johnson, and E. Lever.

Carter, Ledyard & Milburn, of New York City (by Rush Taggart, of New York City), for C. D. Andrews & Co. and others.

Rumsey & Morgan, of New York City (by Mark W. Maclay and Ralph W. Brown, both of New York City), for Marion C. Batten.

Choate, Larocque & Mitchell, of New York City, for Mary L. Stone.

Lord, Day & Lord, of New York City (by F. J. Clark, of New York City), for Herman Hipp.

Nathan Burkan, of New York City (by Herman Finkelstein, of New York City), for claimant Anne De Vore.

Wise, Shepard & Houghton, of New York City (by Arnold W. Knauth, of New York City), for Otto Willi and Maria Ulrich.

Edward J. Leon, of New York City (by Sidney M. Offer, of New York City), for Michael Coriarty.

Kiddle, Margeson & Hornidge, of New York City, for G. H. Halpert.

L. V. Axtell, of New York City, for claimant.

GODDARD, District Judge.

This is a petition for limitation of liability filed in behalf of the owners of the steamship Vestris, which sailed from Hoboken, N. J., on the afternoon of November 10, 1928, on a voyage from New York to South American ports. On the 12th day of November, 1928, she foundered at sea with the loss of 110 lives, the vessel, cargo, and the effects of the passengers and crew. Numerous suits having been brought against them, the petitioners in this proceeding seek to obtain an adjudication as to liability, and to limit it to their interest in the vessel and her pending freight should the court find liability. At the time of her loss, the Vestris was on a voyage from New York to Barbados and South American ports with 325 persons aboard consisting of 128 passengers and a personnel of 197, including officers and crew; also cargo made up chiefly of motor parts and fruits. The estimates of the total weight of cargo, coal, water, stores, baggage, mails, kentledge, and water in her ballast tanks when she sailed on this voyage from New York varied between 7,370 and 7,665 tons.

I. The Vestris was a British steel passenger steamship of 10,494 tons gross and 6,622 tons net register with twin screws, and was 496 feet long, 60 feet 6 inches beam. Her weight light was 7,914 tons in addition to 1,401.74 tons of refrigerating machinery and refrigerating insulation installed two years after she left her builders. The salt water draft assigned to the Vestris in 1912 (when she left her last British port) by Lloyds for the British Board of Trade was 26 feet 9¾ inches for summer, and 26 feet 3¼ inches for winter voyages. Her salt water draft on this—a winter voyage—I find to have been 26 feet 11½ inches. She was built in 1912 at Belfast, Ireland, of the Isherwood type of construction; that is—with the longitudinal framing system. She was built to Lloyd's specifications and was classed "100 A 1" by Lloyd's Registry, which classification she retained after surveys made from time to time by its surveyors. Since 1921 the Vestris had been engaged in trade between New York and South American ports. Her British passenger certificate expired in 1922. But she was subject to the United States Steamboat Inspection Service which made yearly inspections of her, and she held a United States Passenger Certificate and Certificate of Inspection of boats and life-saving appliances. She carried fourteen clinker built life boats which had a total authorized capacity of 800 persons. All the boats, with the exception of Nos. 13 and 14, which were extras, were equipped with "Martin" davits and "Mills" releasing gear.

She was a shelter deck vessel, having three complete decks extending from stem to stern, namely, shelter deck, upper deck, and main deck; also a lower deck extending from her stem to the after end of No. 2 cargo hold forward. On the upper deck was a cross alleyway extending the width of the ship. On the starboard side leading forward from the cross alleyway was the firemen's passage or alleyway. The forward part of the shelter deck was an open deck generally known as a "well deck." It is the open space between the forward end of the bridge house bulkhead and the island erection forward. It is 32 feet fore and aft at the sides and there is no bulwark only an open iron rail. In the well deck were two booby hatches (closed companionways) for the use of the crew in going to and from their quarters to the stokehold; one on the starboard and one on the port side, each located about 18 feet from the ship's side and their after-sides being the forward thwartship bulkhead of the bridge house. They are constructed of steel and riveted to the deck. The openings of the booby hatches were 4 feet 6 inches high and 2 feet wide and faced outboard with 18 inch sills. They had double hinged wooden folding doors 2 to 2½ inches thick. The starboard booby hatch led to the firemen's alleyway. From the firemen's alleyway and the cross alleyway there were four large openings or doorways leading into the starboard shelter 'tween-deck bunker. These openings were provided with loose plates to prevent coal from falling out, but did not stop water from going through. In the starboard shelter 'tween-deck bunker there were two large and one small openings or hatches. There were covers for these hatches but they were not used, and the hatches were left open so that the coal would run down into the lower bunkers as it was used. If water came through the booby hatch it had access through the firemen's alleyway and the cross alleyway, and it would overflow into the starboard shelter 'tween-deck bunker if it got above the coamings which were 9 to 12 inches high. At each end of the cross alleyway is an opening on the side of the ship; these openings are 6 feet high and 4½ feet wide, known as "working doors," and are closed by doors known as "half doors"; these doors are divided into an upper and lower half. Before leaving New York these doors had been closed and white lead and spun yarn packed into the spaces between the doors and the sides of the ship. But it appears that the starboard half doors "stays out a little bit"; that also on the port side the upper half door did not meet the lower one so that a space of about ½ inch was left. The bottoms of these openings were approximately 5½ feet above the water line as the Vestris was loaded when she left New York on this voyage. Each degree she listed brought the starboard half doors above 6 inches nearer to the sea.

At 3:45 o'clock on the afternoon of Saturday, November 10, 1928, the Vestris left the pier at Hoboken for a voyage from New York to South American ports. At the time of her sailing the weather was fine and clear, and according to the credible testimony she had no list. She continued under these conditions until soon after midnight when a slight list to starboard was noticed. By 5 a. m. she had a list of two to four degrees to starboard and two hours later the list had increased to not less than four or five degrees. Around midnight the wind had freshened, and from then until about 7:30 the following morning there was a fresh northeasterly breeze. The wind at 7:30 was about 35 miles an hour. During the latter part of the night water began to come into the stokehold through the starboard ash ejector discharge and continued until about noon on Sunday when the leak was stopped. A considerable amount of water came in here and from other sources, for before noon the starboard bilges were full and the water was up to the floor plates of the engine room which were about 3 feet above the tank tops. Water had also come through an open space in the port half doors into the cross alleyway, but these doors were recaulked and made tight during the forenoon. Early Sunday morning water began coming in through the starboard booby hatch to the firemen's passage in the shelter deck, and later the water from the firemen's passage was overflowing into the starboard coal bunkers. During Sunday evening the wooden doors of the starboard booby hatch were carried away and larger quantities of water came in through the opening and overflowed into the starboard bunkers. By noon, with the wind on her port quarter, she had a list of between 6 and 8 degrees and the wind and sea had risen; and at 12:20 p. m. she was hove to and allowed to lie in the trough of the sea with the engines being operated intermittently at slow speed to keep her up to the wind. In the forenoon the packing around the starboard half doors was washed out as the doors did not fit properly, and water from here ran down into the lower part of the ship and came out of the after end of the starboard side of the stokehold. Several

unsuccessful efforts were made to put in new packing, but it would not stay as the doors were sprung. Beginning Sunday morning, water entered the firemen's passage through the starboard booby hatch and finally overflowed into the starboard bunkers. At 2 o'clock Sunday afternoon upon being informed by the chief engineer of the condition of the engine room and stokehold, the captain ordered starboard ballast tank No. 4 pumped out, and during the latter part of the afternoon No. 5 starboard ballast tank was pumped, but as these tanks had no wing suctions, loose water was left in them. Early Monday morning starboard ballast tank No. 2 was pumped. The effect of pumping out these tanks was to increase the list instead of reducing it.

The weather and sea grew worse during the afternoon, and, at about 7:30 p. m., a heavy sea broke against her port side and she lurched heavily to starboard and some of her cargo in No. 1 hold of her upper deck shifted, breaking a temporary wooden partition. After the lurch she had a list to starboard variously estimated from ten to fifteen degrees. The list gradually increased until she capsized; at 4 a. m. Monday it was about twenty degrees; by noon it had increased to about thirty-five degrees. Just how much more she listed in the period between noon and the time she turned over is uncertain. The storm was most severe during Sunday evening, and the wind reached about force 10 on Beauforts scale (wind at 56 to 65 miles an hour). Between 3 and 4 a. m. on Monday morning, the cover on the starboard hatch in the cross alleyway leading to the after cross bunker was blown up by the pressure of water in the bunkers. At 4 a. m. Monday the water had risen so high that the starboard boiler was closed down, and, although her pumps, with the exception of the circulating pump of the engine, were in operation much of the time, the water was gaining and a bucket gang was organized to bail water from the cross alleyway. This, however, was ineffective and was discontinued at 8 a. m. At 8:37 a. m. the alarm signal "C. Q." was sent out. At 9:56 a. m. the "S. O. S." signal was sent out. This was answered by fifty-eight ships and a number of shore stations. The "S. O. S." signal sent by the Vestris gave her position as Lat. 37° 35' N. and Long. 71° 81' W." which was incorrect by some 37 miles. Sanderson & Sons, the New York agents for the owners, upon being informed of the S. O. S. call by the Vestris, sent at 10:40 a. m. the following message by radio to her—

"Wire us immediately your trouble." At 11 a. m. the captain of the Vestris replied— "Hove to from noon yesterday during night developed 32 degrees list starboard decks. Deck under water. Ship lying on beam ends. Impossible proceed anywhere sea moderately rough." At 11:27 a. m. the representatives of the owners sent the wireless message to the Vestris—"United States destroyer Davis proceeding to your assistance," and they also immediately dispatched a large ocean going tug with salvage equipment.

Shortly before 1 p. m. the water tight bulkhead separating the engine room from the stokehold burst, and soon after this the engineers left the engine room and went up on deck because the engine room, stokehold, and bunkers were flooded. Around 10 a. m., under the personal supervision of the captain, preparations were begun for getting out the port life boats, and the chief officer was ordered to attend to the preparing and getting out of the starboard boats. At this time the Vestris had a list of approximately thirty degrees with her starboard deck under water and port rail high above the sea, and even with the davits swung out to their limits, the boats on the port side would drag along the ship's side while being lowered into the water, and it was a long and difficult operation to get them into the water without tipping them and spilling out the women and children who were placed in these boats which were the first to be gotten over the ship's side, or without damaging the boats. The boats on the starboard side were gotten out and lowered into the water safely with the exception of one, No. 9, which was up-ended and swamped. Many of the crew escaped into the starboard boats by jumping out into the sea and swimming to them or by swarming over the davits and down the falls into the boats. Boats Nos. 4 and 6 were never released from the falls and went down with the ship. No. 8 was damaged during the lowering and repaired, and, although she got clear of the ship, she was swamped shortly after she was lowered into the water. These were all port boats and their passengers were women and children. At about 2:30 p. m. the Vestris capsized and sank in Lat. 37° 38' N., Long. 70° 23' W. which is about 200 miles off the Virginia Capes. The captain was the last one to leave the ship passing down her side into the sea just before she sank and was lost. The steamships American Shipper, Myriam, Berlin and the U. S. S. Wyoming arrived at the place of the sinking of the Vestris during Monday night and Tuesday,

and rescued 213 persons from the life boats and wreckage, bringing some of the survivors to New York; others to Norfolk, Va.

██ II. The petitioners' contention is that they are entitled to exoneration under the Harter Act (46 USCA §§ 190–195) as to the cargo on the ground that they had exercised due diligence to make the Vestris seaworthy on sailing, and that the loss was due to perils of the sea or faults in navigation or in the management of the vessel. Petitioners also contend that, if liability exists, they are entitled, under the Limited Liability Act (46 USCA § 183), to have it limited to its interest in the vessel and pending freight as it was occasioned without its privity or knowledge. The burden of proving the exercise of due diligence is upon the petitioners who seek the benefits of section 3 of the Harter Act, 46 USCA § 192 (The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794), and in proceedings for limiting liability the burden of establishing its lack of privity rests on the petitioners. In re Reichert Towing Line (C. C. A.) 251 F. 214, certiorari denied 248 U. S. 565, 39 S. Ct. 9, 63 L. Ed. 424. The following faults are charged by the claimants against the petitioners:

III. (1) Overloading; (2) open and defective hatches in the shelter deck and sides; (3) failure to determine the stability of the Vestris after the installation of the refrigerating machinery and insulation; (4) failure to instruct the master and the chief engineer of the danger in pumping out the double bottom tanks; (5) negligence in waiting until 9:56 a. m. Monday, November 12th, to send out the S. O. S. call; (6) negligence in respect to care of passengers after the S. O. S. signal was sent out.

IV. In the effort to find the cause of the capsizing of the Vestris it is necessary to go back to the time when the first permanent list appeared, determine the cause of that, and examine the sequence of events and conditions that developed from then on until the end. The history of the event has been narrated by a great number of witnesses. On many points they do not agree, and it is quite natural that the observation and the recollection of some of them would be affected by the mental and physical strain which they underwent. The testimony of others was tinged with a personal interest or that of their employers in the outcome of the litigation. But while there is doubt as to some of the details, the material facts have been established with a reasonable degree of certainty.

██ V. I think the weight of the testimony regarding the weather conditions justifies the conclusion that the weather alone, which was not exceptionally severe for that season of the year, is not an adequate explanation of the loss of the Vestris, and that her loss was the result of a combination of conditions and events, no one of which alone would have caused it. Testimony too voluminous to analyze here in detail has been offered regarding the weather and the experiences of other vessels in the general vicinity of the Vestris. There is considerable variation in the descriptions of the weather and sea. All agree, however, that the wind increased during Sunday afternoon and was at its height Sunday evening and subsided soon after midnight; that on Monday morning the wind had gone down and the weather was fair, although there was a heavy swell. Third Officer Welland, who was called as a witness by the petitioners, testified that at 7:30 p. m. Sunday the wind was between force 9 and 10 on the Beaufort scale, and that during the evening it increased to about force 10, with a high sea running. Welland's testimony impressed me as being reliable, and after considering all the testimony in this respect, I think his statement as to weather conditions is substantially correct. Officers from some of the other vessels in the general neighborhood of the Vestris, although none were very near, testified that the wind reached force 12 Beaufort scale. Whether they are right in this or not no other vessel— and some of them were small—suffered any serious damage. U. S. Weather Bureau Officials who regularly prepare weather charts from radio reports from vessels and other sources described it as a severe Atlantic storm but not a hurricane. The weight of the testimony justifies the conclusion that the storm which the Vestris encountered was no more severe than is reasonably to be anticipated at that season of the year on a voyage from New York to South America; it was not extraordinary and should not have caused serious difficulty for a stable well-found ship. It does not fully account for the loss of the Vestris, which, in my judgment, was due to her not being in proper condition to pass through it safely and which she otherwise would have.

VI. The testimony regarding the draft of the Vestris when she sailed from New York is inconsistent, and, because of its importance, I endeavored to exercise particular care in weighing the character of the witnesses on this point and the quality of their testimony. They were all, at least at the time of the

event, in the service of the petitioners either on the Vestris or upon shore. I also realize that it is practically impossible even for experienced men to observe with accuracy the draft of a vessel without using a box-like device which shelters the marks on the vessel from the movement of the water, for the numerals on the vessel were marked with lines 6 inches apart, and the distance of the water was estimated usually from the point above it. But while these approximate drafts were not accurate, it is probable that the estimates were not unfavorable to the vessel as the owners were apparently content to accept them. And, on a number of previous voyages, the drafts reported to the managers of the line had exceeded the assigned draft, and, on one voyage, to the extent of 14¼ inches.

The log of the Vestris went down with her, but Welland, the third officer, testified the draft entered in the log was aft 27 feet 11 inches. This was the draft reported by Watson, the second officer. The draft of 27 feet 11 inches was the draft from which the pilots "chit" was made, and upon which the pilot charges were based although this charge would have been the same whether it was 27 feet 11 inches or 27 feet 9 inches. Third Officer Welland could not remember the forward draft. Welland has left the services of the company to go into business and has no interest, and his testimony impressed me as being reliable, and I accept the figure as 27 feet 11 inches as being correct for her draft aft. Varying statements by Captain Heasley, petitioners' Assistant Marine Superintendent in New York, regarding the draft, leaves his testimony in this respect open to doubt. In order to arrive at the forward draft I have averaged the forward drafts as reported by Captain Heasley of 26 feet 8 inches, by Lloyd, petitioners' Harbor Master, of 26 feet 8 inches, and by Regan, petitioners' wharfinger, of 26 feet 7 inches, and accept the result of 26 feet 8 inches as her forward draft. Having a forward draft of 26 feet 8 inches and a draft of 27 feet 11 inches, her mean draft was 27 feet 2½ inches. This, however, was her draft at her pier in the Hudson river which is regarded as fresh water in figuring drafts, and a deduction of 4 inches from these figures is allowed for salt water. So that I find the mean salt water draft of the Vestris for this voyage was 26 feet 11½ inches. I certainly do not think it was less than this.

In 1912, upon leaving her builders in Belfast, load line or "Plimsoll" marks were affixed to the Vestris in accordance with the British Merchant Shipping Acts and the draft standards of the British Board of Trade. Under this standard she was assigned a salt water draft of 26 feet 3¼ inches for winter and 26 feet 9¾ inches for summer voyages. So that the Vestris sailed on this winter voyage loaded 8¼ inches below her assigned load line marks for winter voyages, and even below her summer marks by 1¾ inches. While in my judgment the British load line statute and regulations which required the affixing of the "Plimsoll" marks upon a vessel before leaving a British port and provided that a vessel loaded below those marks would be regarded as unsafe, is not applicable as a statute to the Vestris on a voyage from New York, an American port (for the reasons stated in my opinion, 53 F.(2d) 847, filed September 15, 1931), such standards may be and should be taken into consideration together with all other facts and other accepted standards if there be any in determining whether she was overloaded or not. That vessels could only be loaded with safety to a certain depth has been known and recognized by sea-faring nations for many centuries. Load line marks upon vessels were established and officially recognized by the members of the Hanseatic League. Upon the dissolution of the League and the termination of its agreements for carrying on commerce between its members, recognition by one nation of another's load line marks ceased and the marking fell into disuse for a time. However, in 1875 Samuel Plimsoll, who was interested in the welfare of British seamen and owners of British cargoes, and realizing that many seamen, as well as cargoes, had been lost as a result of the overloading of vessels, introduced in the British Parliament in the year 1875 a bill for establishing and marking upon British vessels the point which indicates the limit to which a vessel may be safely loaded and giving to the British Board of Trade broad powers for the proper carrying out of these purposes. In 1876 the bill became a law and was included in the British Merchant Marine Act. It was the purpose of the statute to have marks painted on the sides of the vessel indicating the point, ascertained by recognized standards, below which she could not be immersed without depriving her of a sufficient percentage of reserve buoyancy to insure her safety. In 1876 the plan of determining and indicating the load line mark or "Plimsoll" mark as it is called came into general use in England and was soon followed by several

280

other sea-faring nations. The "British Shipping Act of 1894" required the "Plimsoll" or load line mark to be determined and placed upon all British ships sailing from British ports, and under the British "Merchant Shipping Act of 1906" the rules were made to apply to foreign ships while in British ports "as they apply to British ships." The standard of the British Board of Trade relating to the determination and the affixing of the load line is the result of many years of experience, and the history of the mariners and the ship builders of England is one to inspire confidence in their knowledge and skill in such matters. The weight of the testimony is that it represents a correct measure of safety. Standards for load line marks substantially similar to those of the British are used by many of the sea-faring nations, and there is a mutual recognition of each other's freeboard certificates. The American Bureau in assigning load line marks follow standards which are essentially like those in force in Great Britain, although it was not until September, 1930, that the United States enacted a statute relating to load line marks.

Including the voyages made by the Vestris in the period from January, 1925, up to, but not including, the fatal voyage of November, 1928, it appears that she had made eight winter voyages when she loaded below her marks to the extent of 8¾, 8¼, 4¼, 1¼, 7¾, 14¾, ¾, and 6¼ inches respectively, and had made seven summer voyages when she was loaded below her marks 4¼, 1¼, 16¼, 19¼, 2¼, 4¼, and 3¼ inches, respectively. The ship's logs of each voyage or extracts from them, which included the drafts, were regularly received by the petitioners at their home office in Liverpool after each voyage, so that they were aware of what was going on. These voyages are referred to by the claimants as proof that she was overloaded on several voyages and that the owners knew that it was being done, and are referred to by the petitioners as indicating that it was safe for her to load below her marks as she was on this last voyage.

It is questionable whether the fact that the Vestris had made port on these several voyages although loaded below her Plimsoll mark, indicated that it was a safe practice or whether under favorable conditions she might reach her destination in spite of her being loaded too deeply. It does not appear what the weather or other conditions were on those voyages. But we do know that on this voyage, when the weather was no more severe than might reasonably be expected at that season of the year, she met with disaster.

In 1926 the British Board of Trade, upon learning that the Vestris had sailed from New York on her voyage on the 29th of May, loaded below her assigned marks, wrote to the petitioners asking for an explanation, and were advised by the petitioners that, although the Vestris had left the pier loaded below her marks, she anchored at Liberty (in the New York Harbor) and pumped out enough water ballast to bring her up to her proper marks. This explanation was accepted by the British Board of Trade, but it now appears that this explanation was incorrect as an abstract of the log of the Vestris then in the petitioners' home office would have disclosed.

The Vestris was owned by the petitioner, Liverpool, Brazil & River Plate Steam Navigation Company, Limited, which was a mere holding company as all of its stock was owned and all its ships were operated by the petitioner, Lamport & Holt, Limited. Mr. Wheeler was petitioners' Marine Superintendent in New York, and Captain Heasley was Assistant Marine Superintendent, and both of them knew when the Vestris sailed that she was loaded below her marks, and their knowledge was equivalent to the corporation's knowledge. The Benjamin Noble (C. C. A.) 244 F. 95, affirmed 249 U. S. 334, 39 S. Ct. 292, 63 L. Ed. 631. Moreover, extracts from her logs showing her overdrafts from 1925 to 1928 were regularly sent to the owners, and the practice of loading her below her marks was so frequent and so long continued that the owners were chargeable with knowledge of it. The Bessie J. (D. C.) 268 F. 66, affirmed (C. C. A.) 276 F. 778, certiorari denied 258 U. S. 620, 42 S. Ct. 272, 66 L. Ed. 794; In re P. Sanford Ross (C. C. A.) 204 F. 248; In re Jeremiah Smith & Sons, Inc. (C. C. A.) 193 F. 395. I think it is clear that the petitioners have not sustained the burden of establishing the lack of privity and knowledge which rests upon them under the limitation of Liability Acts. In re Reichert Towing Line, supra.

I think the fair conclusion from all the testimony is that the methods of determining and assigning load line marks of the Vestris were in accordance with the generally accepted practice and that they indicated the point beyond which she could not be loaded without incurring extra risk. In support of this conclusion there is also the testimony of a well-qualified expert.

It may be that loading the Vestris 8¼ inches beyond her marks was not the direct cause of her listing, but it did bring the openings through which water might enter nearer to the water, and as several of her openings were not watertight, water came in. While a reduction of only 8¼ inches in freeboard might alone not have been particularly serious, this loss added to the reduction in her freeboard due to the fact that she was a tender vessel and listed between four to five degrees early Sunday morning with a consequent loss of freeboard on her starboard side of about 6 inches for each degree of list, resulted in bringing her openings on that side between 32¼ and 36¼ inches nearer the water at that time. The vital significance and the value of a few inches of freeboard are reflected in the action of Lloyds and the British authorities by assigning to the Vestris, after careful consideration, 6½ inches less freeboard for summer voyages than voyages in the winter season. Loading below the marks also reduced her reserve buoyancy by several hundred tons. When a vessel lists over the maximum stability is arrived at about the time or shortly after the time that the edge of her deck begins to go under water so that the less freeboard the sooner that point is reached and consequently her range of stability becomes diminished.

VII. When she left New York on Saturday, the Vestris was on an even keel; between midnight and 2 o'clock on Sunday morning a slight list to starboard was noticed; between that time and 5 o'clock in the morning she had taken a permanent list to starboard of two to four degrees; at 7:30 a. m. the clinometer indicated a list of between four to five degrees. There was merely a fresh northeasterly breeze during this period, and, although it had increased at 7:30 a. m., in the wireless report, which it was customary for vessels to send in to the U. S. Weather Bureau, the Vestris reported the wind then at a force which, according to the code issued to the Vestris by the Bureau, was about 35 miles an hour. While there is conflicting testimony as to the severity of the weather during Sunday afternoon and evening, there is no doubt at all that up to Sunday forenoon the weather was moderately good, and the only reasonable conclusion that can be drawn from the fact that the Vestris listed four or five degrees under the conditions existing before 7:30 Sunday morning, in the absence of other cause, is that she was a tender ship and lacked stability. This conclusion is confirmed by the testimony of Welland, her third officer, and others. Welland testified, on cross-examination, as follows:

"Q. As a matter of fact you know this was a tender ship, didn't you? A. Yes.

"Q. She had had lists before when you had been on her, hadn't she? A. She had experienced lists."

Referring now to the fact that the Vestris was a tender ship, which I think is fully established, it may well be that her tenderness alone would not have occasioned her loss and that she would have made her port, but being tender she was more susceptible to other troubles which might become serious in the extreme; if there was a continued incursion of water and it was not gotten rid of, it would run to the lower or starboard side and increase her list to such an extent that some of the openings on that side would be submerged, and, if she was lacking in adequate freeboard, there would be greater danger of this occurring. Looking back over the situation as it progressed, it appears that, due to her reduced freeboard caused by her being too deeply loaded and also by her having a list, defective openings in her sides and deck were, during the storm, brought nearer to the sea; also that water came in through them, and much of it was not gotten rid of and ran to her lower side, and this gradually increased the list until her starboard half doors were submerged—these would begin to submerge if she listed 11 degrees—and later other openings which finally resulted in her capsizing. While the explanation that a sanitary pipe may have broken allowing water to be discharged into the ship and caused the list, is advanced, the state of the weather or the sea was not such during the period as to break a sound pipe. It is also quite apparent that, if a ship has a list and she ships water through any source and it is not gotten rid of, it will flow to the lower side and tend to increase the list. And I think that there is no doubt that the fundamental cause of the increasing list and foundering of the Vestris was due to sea water which came aboard her through various openings and remained in the vessel although the list was aggravated by pumping the water out of some of the tanks on the starboard side.

It is therefore necessary to search for the sources by which the water entered and to ascertain whether the petitioners were at fault with respect to them or any of them. And it is of course true that the deeper she was loaded, the less freeboard she had, and

the less freeboard, the nearer her openings would be to the sea. Openings on the lower side would be brought still nearer to the surface of the water by the listing of the vessel. If a vessel has a list, it is evident that the incursion of water will increase the list because it will tend to congregate on the side of the vessel which is lower, and this results in reducing the freeboard on that side and bringing the openings on that side nearer to sea, so that she is exposed to further danger if water gets through any of them. The proof is that there were several openings where water did enter, which, under the circumstances, resulted in further increasing the list so that her half doors on the starboard side were gradually submerged, allowing water to enter around the bottom and the sides of the doors, causing her to list more and more until other openings were exposed, and finally causing her to capsize and sink.

While it is obviously impossible to measure the amount of water that entered the ship at the various openings, I think there is sufficient evidence upon which to base a reasonable estimate of the amount of water that came in and the effect of it. The principal places where water entered were the starboard booby hatch in the shelter deck, the half doors in the sides, and the ash ejector.

VIII. The water which came through the booby hatch was particularly serious and perhaps was one of the principal contributing causes of the loss of the Vestris. Water which came in through the booby hatch ran down into the firemen's passage and the cross alleyway to the starboard shelter 'tween-deck bunker, and thence through hatches into the lower bunkers. If water ran into the coal, it could not be reached by the pumps, or to be more accurate, the pumps could only get at water that filtered through the coal and was not absorbed by it. The testimony of Professor Bugbee, Associate Professor of Mining Engineering and Metallurgy at Massachusetts Institute of Technology, who conducted an experiment with coal similar to that in these bunkers, is that the coal would hold and absorb, or as he described it "entrain" water weighing about 16 per cent. of the weight of the coal, if there was a free opportunity for draining, and as the drainage was prevented in some of these bunkers the coal might entrain as much as 31 per cent. in water. Water entering the booby hatch would have access to some 2,300 tons of coal, so that 360 tons of water might be held in the bunkers before it reached the bilges. All of this water would be on one side, and as, and if, it enter-

ed, the list would increase and the margin of stability diminish, and as much of the added weight would be high up it would tend to emphasize its adverse effect for it raised the center of gravity and reduced the ship's metacentric height. Her freeboard would, of course, be decreased, and the openings on her sides, the half doors, etc., brought nearer to the water.

The Vestris was a well deck vessel and the seas were breaking over it and flooding it, as they would be likely to do in rough weather. If the opening was not tightly closed and the water in the well was higher than the 18-inch sill of the booby hatch, as it must have been to carry away the door, it would enter and run down into the firemen's alleyway. The testimony as to when the water began to enter through the booby hatch and the amount which came in there is contradictory, but my conclusion from it all is that, during the period from Sunday morning on, water was coming in through this opening at frequent intervals, and that a considerable amount of water accumulated in the upper starboard bunkers from this source, even before the door of the hatch was completely carried away which occurred Sunday evening, and when that occurred a larger volume of water came in. There is testimony of several witnesses that there was water in the firemen's alleyway Sunday morning, and that late Sunday the water in this alleyway was splashing about and overflowing into the 'tween-deck coal bunkers. There were two scuppers in this alleyway, but they did not carry away the water which came there either because they were small or stopped up. Whether the water, which began coming in through the booby hatch Sunday morning, all came through spaces between the bottom of the door and the sill and around the sides; whether some of it came in when the door was opened by the crew in going back and forth, or whether the door was damaged and began to leak before it was entirely carried away, is not definitely shown, but there is a strong inference at least that it was a result of a combination of these conditions.

The two large hatches inside the shelter deck bunkers leading into the lower bunkers were not closed or battered down but were left open so that the coal might run by gravity to the bunkers below as the coal was being consumed. This allowed water to lodge in these bunkers where it could not be reached by the pumps. The starboard hatch in the cross alleyway was battered down Sunday forenoon and a small hatch in the corner of

the shelter 'tween-deck bunker was closed Sunday evening. Why the others were not battered down then is undoubtedly explained by the fact that the hatches and coverings were not available in this emergency. As originally constructed, the hatches had hatch coamings and hatch covers which, when in place, prevented this very thing. It had been their practice since the time the vessel was received from the builders to leave these hatches open, and both Mr. Wheeler, petitioners' Marine Superintendent in New York, and Captain Heasley, Assistant Marine Superintendent, were aware of it. There were covers for these hatches, but they were never used and were left on the deck of the bunkers and the coal was dumped in on top of them, so that the covers were buried under the coal and not available unless the coal was removed.

It is urged by claimants that means should have been provided for stopping the water at the upper deck either by having an effective door for the booby hatch opening or by the closing of the hatches in the bunkers of the upper deck. This was a necessary requirement. The petitioners contend that there was a due compliance with this necessity, but in view of what happened I cannot agree with them. In "Practical Shipbuilding" by Campbell Holms, Third Edition, p. 71, which was referred to by both petitioners and claimants upon the trial as a recognized standard book on Naval Architecture it is stated that:

"Class 1 closing appliances (in superstructures) must be of steel or iron; when closed they must be as strong as the intact bulkhead and practically watertight. Neither they nor the means of securing them may be detachable from their positions, and the arrangement must be such that the openings may be closed from both sides. * * *

"Class 2 closing appliances may consist of hard-wood doors, at least 2 inches thick, not more than 30 inches wide, having sills at least 15 inches above the deck. Or they may consist of cross shifting boards, fitted the full height of the opening in channels riveted to the bulkhead, having a thickness of 1 inch for each 15 inches span, with a coaming plate at least 15 inches high. * * * The deck within a superstructure closed by Class 2 appliances must be watertight. Hatchways and other openings in the deck must have coamings at least 9 inches high, and means of closing as effective as those required for hatchways on the after part of a superstructure deck (Art. 455). Doorways in machinery casings protected by

such a superstructure, must have coamings at least 15 inches high.

"If there are no means of closing openings in the end bulkheads of a superstructure, all openings in the deck within the superstructure must be protected by coamings at least 18 inches high; and as the deck is here practically a weather deck, freeing ports must be provided for in the sides, having an area of at least 2 square feet for each 10 feet in the length of the superstructure—except in the case of short open forecastles."

The regulations referred to in article 455, mentioned above, require the same methods of closing by strong backs, hatch covers, and tarpaulins fastened with iron bands and wedges as on the open decks of cargo ships, except that the coaming in the shelter deck need be only 9 inches high instead of 18 or 24 inches as required for hatches of an open deck.

The petitioners admit that the Vestris should have had class 1 closing appliances on her superstructure, but contend that the requirement for class 1 closing appliances applies only to "openings in the end bulkheads of superstructures." However, it seems to me that the opening of the booby hatch was in fact equivalent to an opening through the end of the bulkhead of the superstructure, and that the same reasons for having class 1 steel door for openings on the superstructure apply with equal force to the opening of the booby hatch; therefore that either the class 1 closing appliances of steel should have been provided for the booby hatch or the hatches in the upper deck bunkers should have been closed. Either of these arrangements would have prevented water from entering and going down into the vital parts of the vessel. That these wooden doors were in an exposed place and liable to damage is further indicated by the fact that doors of the booby hatch similar to these had been carried away on a previous voyage.

The petitioners take the position that the owners had done all that they were required to do as they had "provided" covers for the hatches and were not responsible if those on the ship failed to use them. But when the Vestris sailed her shelter 'tween-deck bunkers were filled with several hundred tons of coal, and it was practically impossible in a sudden emergency to get at the hatches buried beneath the coal and batter them down. Cases holding a vessel unseaworthy where she sails with open ports and cargo stowed in such a manner that they cannot be gotten at

afford analogy. See International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; The Manitoba (D. C.) 104 F. 145. In the International Navigation Co. Case, Mr. Chief Justice Fuller said at page 225 of 181 U. S., 21 S. Ct. 591, 593: "We do not think that a shipowner exercises due diligence within the meaning of the act by merely furnishing proper structure and equipment, for the diligence required is diligence to make the ship in all respects seaworthy; and that, in our judgment, means due diligence on the part of all the owner's servants in the use of the equipment, before the commencement of the voyage and until it is actually commenced."

The practice of leaving these hatches uncovered had continued for many years, and both the Marine Superintendent and the Assistant Marine Superintendent in New York knew it, so that the petitioners are chargeable with privity and knowledge of the fact.

IX. "From the beginning of the day" Sunday, water was coming in at times through the opening around the starboard half doors where the packing of spun yarn and white lead had been washed away, and although the ship's carpenter put in new packing several times the seas kept washing it away. He said that "That door stays off a little from the ship's side, a little like that— the door (indicating) * * * and when the sea is working in there it washes all the spun yarn out." And his following testimony is significant not only in respect to the condition of this half door, but in connection with the reduced freeboard:

"Q. Don't you think that at the same time the water was washing out the packing in the coal ports? A. No.

"Q. Why not. A. The coal ports have been tighter than the half door. The coal ports—they were not so big as the half door and in between the ship's side and the half door is more room for water.

"Q. What do you mean by more room for the water? A. Well, the sea goes more on the doors and in that way the coal port is a little bit higher than the half door.

"Q. Not very much higher? A. No much.

"Q. How much higher? A. Well, about two feet."

From the plan of the Vestris, it appears that the opening for the half doors is 6 feet high and 4½ feet wide. The door is divided into two sections of half doors—an upper and lower. The coal ports are 3 feet wide and 2½ feet high, and the top of the coal port is on a line 2 feet above the top of the half door opening; the line of the bottom of the coal port is 6 inches below the top of the half door opening. The total amount of water which came in through this opening was under the conditions extremely serious in view of other conditions, although a greater quantity came in here after the doors began to be submerged which would have been when her list reached 11 degrees which occurred early Sunday evening. During the forenoon there was, at times, some 2 feet of water in the starboard end of the cross alleyway, part of which ran off into the bunkers and lower part of the vessel.

X. The starboard ash ejector began leaking very early Sunday morning and the water ran into the stokehold. At noon time, when it was stopped, it had filled the starboard bilges up to the floor of the engine room which was about 3 feet above the tank tops. Part of this water was pumped out but 18 inches remained in the afternoon and this was free surface water which would tend to run to her lower side and reduce her stability.

XI. At 6 o'clock Sunday morning it was discovered that water was coming in through an opening between the port half doors. The ship's carpenter who repaired it around 11 o'clock that morning testified that he could see about ½ inch of daylight between the upper and lower doors where they failed to meet. While some water entered at this point for several hours and added to the general situation, I do not think that the amount which could have come in through this opening could have been very much, and the condition of these doors is not a ground for serious criticism.

XII. Although the main engine pumps were in operation from 9 o'clock Sunday morning on, and the ash ejector pump was put in operation Sunday night, the water in the vessel increased for more came in than these pumps could get rid of. The combined capacity of these pumps was limited to 180 tons an hour as they all discharged through one 3½ inch pipe, and, on two occasions during Sunday afternoon, the ballast pump was used to pump out ballast tanks. The bilge injection pump was ordered into operation at 8 p. m. on Sunday. The use of this pump included the closing of the sea injection valve which supplies water from the sea to the circulating pump and thence through the condenser, also opening the bilge injection valve so that water is taken from the bilges instead of the sea and pumping it overboard through the condenser. However, when the bilge in-

jection valve was opened and the sea in-jection valve was closed, the pump raced and did not work and the use of it was abandoned.

■ XIII. The initial stability of the Vestris, either in light condition or as loaded, was unknown at the time she sailed. There are a number of factors which must be definitely and precisely established from which the metacentric height and initial stability of a vessel laden with cargo is computed, and it is now impossible to determine the metacentric height or her stability when she sailed as her metacentric height light is unknown and the weight and exact distribution of the cargo can only be estimated and approximated. These estimates of the dead weight capacity of cargo, coal, water, stores, etc., vary and the total of these variances is so material that the results are not reliable. Her metacentric height in light condition at the time of the commencement of this voyage was negative as compared with neutral at the time she left her builders' hands, as a result of the refrigeration machinery and insulation subsequently installed, according to computations made by Professor Jack which appear to be correct, but these computations also are partly based upon the estimated weight and metacentric height of this refrigeration machinery and insulation. Stability is such a vital thing in a ship it would seem that the owners of the Vestris were remiss, under the circumstances, in not definitely determining her metacentric height for she must have adequate metacentric height to insure her stability and safety, but admittedly they did not know what it was. When her builders conducted the usual test at the time she was built, her metacentric height in light condition was neutral. But between 1912 and 1928 several hundred tons of additional refrigerating machinery and insulation were installed. Correspondence passed between Lamport & Holt, Limited, in Liverpool and Workman, Clark & Company, builders of the Vestris, after the refrigeration installation had been completed in New York in 1914 which resulted in some 1,400 tons being added to her weight, in which reference was made to the fact that this would impair, to some extent, her stability as it undoubtedly would do. However, her metacentric height was never redetermined either by attempted computation or by a new inclining test, and it is now impossible to determine accurately what it was. Professor Jack states that would be little more than a guess to attempt to compute it now; that in his judgment a much more nearly accurate result may be obtained by a

comparison with the Vauban, a sister ship, whose metacentric height had been determined by an inclining test in February, 1929, and make allowances for the differences between the two vessels than to attempt it by independent computations with many factors unknown, and that even by this method only the approximate metacentric height of the Vestris in light condition may be ascertained.

The Vestris and the Vauban were alike in form, but the Vestris was built in the Isherwood system, in which the strengthening beams ran fore and aft, while with the Vauban the rib system was used in which the main strengthening members ran transversely, with the result that the Vestris was lighter by 322 tons than the Vauban. Professor Jack, after estimating the height above the keel of the center of gravity (K. G.) of this 322 tons, and using the result of the inclining test of the Vauban in 1929 as a basis and making fair allowances for some differences in the insulation, etc., calculates that the metacentric height of the Vestris in light condition was .65 of a foot negative; that of the Vauban being .71 of a foot negative, this figure being conditioned upon her bottom tanks being kept full and hard pressed.

Both the Vestris and the Vauban were intended for carrying cargoes of chilled meats, and when they left the builders' hands some refrigerating machinery and insulation had been installed in each, although this work had progressed considerably further in the Vauban with the result that several hundred tons more had been placed aboard her than on the Vestris, and in 1914, when the refrigerating machinery and insulation were completed on the Vestris, some 1,400 tons had been added to her since she left the yards of Workman, Clark & Company, her builders in Liverpool. The completed refrigerating machinery and the insulation on the two vessels were the same, except that the installation of the insulation on the Vestris required changes in details so as to conform it to her longitudinal frame, as the Vauban had a transverse frame. And it seems evident that the range of error is very much less in estimating the allowances which should be made for the small differences in the insulation of the two vessels due to the fact that one had cross beams and the other longitudinal beams, than in attempting to estimate the effect which this added 1,400 tons would have on the original metacentric height of the Vestris.

Mr. Camps has endeavored to compute the metacentric height of the Vestris loaded as she sailed, independent of the Vauban test,

and calculates that it was 1.77 of a foot positive. But it is evident that even the best effort of a highly qualified expert to now determine by mere computation what the metacentric height of the Vestris was in a loaded condition when she sailed on this voyage, is bound to be speculative, for not only was her metacentric height in light condition unknown, but also the weight and distribution of her cargo, water, coal, etc., can only be estimated and the range of error to which these estimates are subject to would materially affect the result of the mathematical calculations.

 I am quite convinced from the testimony in this case and from several authorities on the subject of shipbuilding, which I have studied with care, that the most satisfactory and the usual method of determining the metacentric height of a vessel of this type is by an inclining test, if that is possible, and, if not, to use the figures obtained from an inclining test of a similar vessel and to calculate their differences. And it is significant that in 1921, when it was decided that the stability of the Vauban should be determined, an actual inclining test was used. It seems to me that the nearest approach that can be made to determining the metacentric height of the Vestris as she sailed loaded on this voyage, is to ascertain her light condition by comparison with the result obtained in the last inclining test of the Vauban, make allowances for the differences between the two vessels, and then estimating the weights and distribution of the cargo, water, coal, etc., placed on board her, calculate what her metacentric height would have been under those conditions. Applying this method, it appears that the Vestris as loaded for this voyage would have had a metacentric height of 1.22 feet positive, assuming that her bottom tanks were full and hard pressed up. Most of the estimates upon which this calculation is based, with the exception of the light weight of the Vestris, were made up by the petitioners with the exception of the amount of coal which was probably about 3,000 tons instead of 3,019 tons, and are subject to a material range of error not only as to the amount but also as to distribution of the weight. In making this calculation, a draft of 26 feet 11 inches was assumed while I find that her draft was 26 feet 11½ inches. My own conclusion, after going into the matters in considerable detail, is that the Vestris in light condition (but with bottom tanks full and hard pressed up) had a metacentric height of approximately .65 feet negative;

that the cargo that she carried tended to and did change her metacentric height from negative to positive, but that the exact amount of her positive mentacentric height it is now impossible to determine owing to the lack of definite information as to the weights and distribution of cargo, coal, water, etc., probably slightly under one foot positive, which is regarded by naval engineers and architects as sufficient provided that her deck openings and sides are watertight, although likely to make her tender; and that her small margin of metacentric height and other conditions resulted in her being a tender ship. This conclusion is confirmed by her actual performance early Sunday morning when she listed between two and five degrees, and at that time the wind was not of sufficient force to affect a stable vessel.

 XIV. The chief engineer on orders from Captain Carey had the starboard tanks Nos. 4, 5, and 2 pumped out. The pumping of No. 5 tank began shortly before 2 o'clock on Sunday afternoon. All the water which the pump could reach was gotten out by 5 o'clock; at 6 o'clock pumping began on No. 4 and was completed between 7 and 8 o'clock. Neither of these tanks had wing suctions so all the water could not be gotten out of these tanks. At 4 o'clock Monday morning pumping was begun on No. 2 tank and finished around 7 o'clock. This tank was pumped dry as it had wing suctions. Instead of correcting the list to starboard, the pumping out of these tanks had the opposite effect. These tanks are located in the very bottom of the ship, and the removal of the weight from that point raises the center of gravity of the ship and decreases the metacentric height (G. M.). Furthermore, as some of the tanks could not be completely pumped out, loose water was left in the tanks which would flow to the low side and aggravate the list. The petitioners concede that the pumping out of these tanks was wrong, but contend that this was merely a fault in seamanship and management by the vessel's master and officers, for which the owners are not responsible. However, it appears that, when the refrigerating machinery was installed in the Vestris as previously mentioned, the builders of the Vestris, Workman, Clark & Company, in a written communication to the owners, stated:

"In the case of the 'Vauban' and 'Vestris' we find it necessary for trim and stability that Nos. 1, 2, 3, 4 and 6 double bottom tanks be filled, all the tanks with the exception of No. 6 fresh water tank being hard pressed. In addition to this forepeak is filled, giving a

total of 1035 tons of water ballast. * * * We may mention that each of the vessels will be stable under any of the conditions we have stated, but it is understood that once the vessels get outside the river at Buenos Aires, the double bottom tanks will be filled to give sufficient stability for the voyage."

Despite this warning, the owners did not at any time inform Captain Carey, the master of the Vestris, or Mr. Adams, the chief engineer, as to the necessity of keeping filled these tanks of the vessel hard pressed up. The capacity of the tanks is No. 1—60 tons; No. 2—280 tons; No. 3—300 tons; No. 4—220 tons; No. 5—270 tons; and No. 6—90 tons. Mr. Alfred Woods, the general manager of the petitioners, admitted upon the trial that this information should have been conveyed to the master and officers of the Vestris. Failure by the owners to warn the officers of the Vestris of this requisite condition for the maintenance of her seaworthiness indicated, I think, a lack of due diligence on the part of the owners which their duty required. The pumping of these tanks was a contributing cause of the disaster as it tended to increase the list, and the list finally resulted in the foundering of the ship. In the Elkton, 49 F.(2d) 700 at page 701, Judge Learned Hand of the Circuit Court of Appeals of this circuit, said: "But existing unfitness, though it arise only from ill handling of adequate equipment, must be so known at the outset; else she is unseaworthy, not being herself suited for her service, and not carrying a crew properly advised as to her needs. * * * The shipper * * * bears no loss until the owner has done his best to remove all risks except those inevitable upon the seas."

In Standard Oil Co. v. Clan Line, L. R. 124 App. Cas. 100 (J. L.), the master of the Clan Gordon while at sea ordered two of her water ballast tanks emptied for the purpose of trimming her more by the stern. When they were nearly empty she heeled, turned over, and became a total loss. Some years previous, after the loss of a sister ship by capsizing, the builders had warned the owners that, when she was loaded as she was on this voyage, the water ballast tanks must be kept filled. This information was never given to her officers. It was held that the vessel was inherently unseaworthy in certain not improbable conditions unless special precautions were taken, and that the failure to warn the master constituted a breach of the shipowners' duty to exercise due diligence. Lord Atkinson said: "I think that the re-spondents by leaving the captain of the 'Clan Gordon' in ignorance of these instructions, by failing to bring them to his notice so that he would grasp and understand them, failed to discharge the duty they owed to the shippers of the cargo the vessel carried, and failed to use due diligence to make their ship seaworthy." Page 123 of L. R. 124 App. Cas.; The Schwan, L. R. (1909) App. Cas. 450 (H. L.).

XV. The Vestris carried fourteen life boats including one motorboat with a total capacity of 800 persons, which were ample accommodations for the 325 persons on board. The life boats were of wood clinker built construction with copper air tanks that would keep them afloat although the boats filled with water, and with the exception of two which were extra boats, were under davits. These were "Martin" davits with "Mills" releasing gear which are generally regarded as satisfactory. Each boat carried the equipment of sails, oars, lanterns, bailer, food, water, etc., in conformity with the United States inspection laws, although some equipment was lost in launching the boats and in other ways for which the owners are not responsible. The life boats had all been examined by the United States inspectors a few days before she sailed, each boat having been lifted clear of the chocks with more than the official capacity number of persons in each boat. Lloyd's surveyor had also made a recent external examination of them and reported them in "very good condition." It is true that the boats were subjected to a tropical climate much of the time which has a tendency to dry them out and cause leaks, but it was the custom to keep water in them to prevent this.

Several of the survivors who spent Monday night in the life boats have testified that there was water in them. This, I find, was chiefly the result of the waves coming over the boat's sides and the rain during the night, although water undoubtedly did come in through some of the seams, but no more than could have been gotten rid of by a reasonable amount of bailing. No. 8 boat had a hole stove in her bow while being launched. With the extreme list which the vessel then had, it was a lengthy and difficult job to launch a boat so that the damage to No. 8 boat is readily explained. An inefficient effort was made to patch the hole with a piece of tin, but it did not prevent water from coming in, filling and capsizing the boat several times before being picked up. During this time many of her occupants were lost as pathetical-

ly described by survivors. From what we now know, it seems to have been a mistake in judgment on the part of the captain who was in charge to have made use of this boat instead of trying to launch another to take its place. However, I find, after full consideration of all the evidence, that the Vestris carried a sufficient number of seaworthy and properly equipped life boats.

The Vestris followed the usual custom of allocating boat stations to members of the crew. Notices were posted in the cabins informing the passengers of their respective boats in the event of the ship meeting with disaster. On this occasion the system was not adopted. The captain himself took charge of the port boats and the chief officer was ordered to take charge of the starboard boats. The signal of one long blast, which was the call to boat stations, was never given because of the desire to avoid a panic. All passengers and crew were, however, notified and apparently there was no general panic or exceptional confusion. As a result of the captain's effort to obey the mariners' law of chivalry "Women and Children First" they were placed in the first boats which were attempted to be launched with the lamentable result that as two of the boats were not gotten clear of the vessel's sides and into the water before she sank, the women and children in them went down with the ship. This accounts for the unusually large proportion of women and children who were lost.

Since the disaster there has been much discussion and criticism of the fact that the port boats instead of those on the starboard side were used for passengers. This was an operation that was difficult and not free from danger for the ship at this time had a list to starboard of upwards of 35 degrees, and the port boats were 50 to 60 feet above the sea. Oars were used as skids in an attempt to hold the boats off from the side of the ship, and extreme care was necessary to prevent a boat from overturning as it slid along the side of the ship, for the arm of the davit was, of course, not long enough to carry the life boat beyond the sloping side of the ship, lying in the position in which she then was. The starboard rail was under water and so that it would seem to have been better to have used her starboard boats for more of her passengers, and this seems to be demonstrated by the fact that all of the starboard boats were successfully launched with the exception of No. 9 which was swamped, and No. 13 which floated off; while only No. 8 and No. 10 were successfully launched on the port side. How-

ever, it was difficult and dangerous to get the passengers into the starboard boats either before or after they were launched. Passengers might have been put in the starboard boats while the boats were still in the chocks on the boat deck and swung out with the boats but this was not free from danger. Members of the crew who escaped in the starboard boats either climbed out on the davits and dropped into the boats after they were launched or jumped into the sea and swam to the boats. To launch the port boats with the passengers over the port side or on the starboard side was a difficult and serious problem —both hazardous—and although it may be that the master decided unwisely, it is interesting to note that upon the torpedoing of the Lusitania in 1915 and the attempt of the officers in charge to launch some of her boats with passengers from the high port side, some criticism of it was made later in the litigation which followed, and the court held that, under the conditions at the time of the sinking which were not dissimilar to those with which the officers on the Vestris were confronted, those in charge could not be regarded as negligent even though it proved to have been extremely hazardous.

Captain Carey, the master of the Vestris, who was faced with the actual situation, was a man of many years experience at sea, a goodly number of which he had been master on passenger ships, and the facts do not justify a conclusion that he acted negligently in deciding or in his attempt to carry out his plan of launching the port life boats. On the contrary, from the time he took personal charge of the work of loading them and getting them overboard until he went down with his ship, he was devoting all his efforts to saving the passengers before she sank, and he met this last crisis with the courage and the fidelity traditional with men of the sea.

XVI. The Vestris was equipped with radio apparatus and three wireless operators provided continuous watch. On Monday morning, between 8 and 8:30 E. S. T. o'clock, pursuant to an order from Captain Carey, the Vestris' position was obtained by wireless and plotted, and at 8:37 the alarm signal "C. Q." was despatched. At 8:47 the Tuckerton Station rebroadcast the message as follows: "All ships in the vicinity of Vestris please stand by and keep close watch for any distress messages may develop trouble." ("Stand by" as used here, meant to be listening in for the next message.)

At 9:56 a "S. O. S." message was sent out and was followed by the words "Requires im-

mediate assistance please dangerous list going over all time starboard."

At 11:04 the Vestris repeated the "S. O. S." call. The two "S. O. S." messages were received by 58 ships; 6 of which were then within a radius of 100 miles of the Vestris; 13 within a radius of 150 miles, and 26 within a radius of 200 miles. From an examination of a chart of these vessels it is apparent that, if the "S. O. S." message had been sent between 5 and 6 hours sooner, one or more of them probably could have reached the Vestris before she went down and rescued her passengers.

After the lurch at 7:30 on Sunday evening, the Vestris had a list of ten to fifteen degrees, and at midnight it had increased to fifteen degrees; at four in the morning, in spite of everything that had been done, the list was about twenty degrees and was increasing. There was two feet of water on the starboard side of the engine room. The fires of the starboard boiler had been put out by the water and they were having trouble with the pumps. It must have been apparent sometime after midnight Sunday and before 4 o'clock Monday morning, that the Vestris was in a desperate condition, and that ships in the vicinity should be summoned to which her passengers could be transferred. Aside from the high degree of care which the captain of the ship was required to exercise as a common carrier of passengers, ordinary prudence demanded that every effort should have been made by that time to obtain such assistance. Why Captain Carey neglected to summon aid sooner will probably never be known. Certainly he should have done so, and it can only be assumed that he failed to fully realize the great danger to his passengers and ship.

Claimants cite the following paragraph contained in a book of "Instructions to Masters" issued by the steamship lines to its masters as an authorization or encouragement for its masters to unduly risk the safety of its passengers and ships: "In the case of a serious disaster happening to one of the vessels of this line while at sea the master must in the first instance carefully consider the actual amount of the peril there may be for the lives of those under his charge and then judge whether he will be justified or not in fighting his own way unaided to the nearest port. His being able to succeed in this will always be considered a matter of high recommendation to him as a master." Page 48.

However, such a conclusion seems a doubtful one.

The agents of the line got their first information that the Vestris was in distress when they heard that she had sent the general "S. O. S." message and wirelessed Capt. Carey as follows:

"November 12, 1928 10.28
"Captain 'Vestris'
"Wire immediately your trouble
"Lamport."

To which he replied:
"November 12, 1928. 11 AM
"Hove to from noon yesterday. During night developed 32 degree list to starboard. Deck under water. Ship lying on beam ends. Impossible to proceed anywhere. Sea moderately rough.

"Carey."

Upon receipt of this information, Lamport & Holt, the agents of the line in New York, sent the following wireless message to the Vestris at 11:27 a. m.: "United States Destroyer Davis proceeding to your assistance." The representatives of the owners also chartered a large ocean-going salvage tug and sent her to the aid of the Vestris. But although both vessels proceeded with all reasonable expedition, they arrived at the scene of the disaster too late; the Vestris had disappeared and the survivors had been rescued by other vessels.

XVII. While it is true that certificates of condition had been obtained for the Vestris which, in the absence of anything to the contrary, are entitled to more or less weight, they must be valued in the light of what the actual conditions proved to be. For instance, certificates do not alter the fact that the port half doors were in such condition that on Sunday one could see half an inch of daylight between the upper and lower doors and the starboard half doors were sprung and could not be closed tight, and that nothing had happened since the beginning of the voyage which would have effected good doors. The certificates should also be read in the light of other conditions which are referred to. Moreover, Lloyd's regulations required that the hatches in the shelter 'tween bunkers should be capable of being made watertight, and Lloyd's surveyors as well as the United States Inspectors were unaware that these would be left open on sailing. It does not appear that the United States inspection service considered or tested the stability of the Vestris, its inspection was principally

concerned with engines, equipment, lifeboats, life preservers, and general conditions. And it is important to keep in mind that the Lloyds certificates were issued upon the express condition that the Vestris could not be loaded below her "Plimsoll" marks and that the others were undoubtedly issued upon the assumption that she would not.

XVIII. Two distinguished naval architects and marine engineers testified respecting the seaworthiness of the Vestris upon her departure upon this voyage. Mr. Harold Edward Joscelyn Camps of London, England, called by the petitioners, and Mr. James Robertson Jack of Scotland, now Professor of Naval Architecture and Marine Engineering at the Massachusetts Institute of Technology, called by the claimants. These experts, after being informed of all the known facts, disagree in respect to her being seaworthy; Mr. Camps testified that in his opinion she was seaworthy, and Professor Jack that she was not as she was so deeply loaded that her openings were brought dangerously near to the water that she should have had a steel closing for the booby hatch or the hatches in the upper deck should have been made watertight, and that she lacked a safe margin of stability and reserve buoyancy. With due deference for the views of both of these experts, my own conclusions, after very careful consideration, are that the facts seem to me to support the opinion of Professor Jack, not alone because of what actually did occur, but because it seems to me apparent, from the history of the disaster; that a principal contributing cause of it was the overloading which allowed incursion of water through defective openings and which increasingly affected her list and finally resulted in her foundering; also that her margin of stability and reserve buoyancy was not sufficient to carry her through a situation which was reasonably to be anticipated.

XIX. In an effort to account for the disaster, the petitioners advanced the theory at the trial that it was due to a broken pipe or pipes leading through the bunker space; possibly the four inch salt water overflow pipe running through the shelter 'tween-deck bunker space from the sanitary tank on the boat deck which discharged through the ship's side a short distance above the upper deck; or possibly one of the three pipes leading through the hanging bunker below the upper deck discharging through the ship's side, each of which had a storm valve directly connected to the skin of the ship. Two of these three pipes leading through the hanging bunker

discharge through the ship's side below the half door in the cross alleyway; one was a 3½ inch scupper to the cross alleyway itself; the second was a 5 inch soil pipe from the "W. C." on the shelter deck; the third was a 1½ inch scupper from the firemen's passage. This third pipe was in the immediate neighborhood of the coal shute, the latter being about midway between the soil pipe discharge and the firemen's alleyway scupper discharge. There were also 19 other pipes discharging through the shelter 'tween-deck bunker space. Previous to sailing, these pipes had been examined and found in good condition. The theory that one of these pipes must have broken and permitted loose water to escape into the ship is largely based upon the petitioners' assumption that at 7:30 Monday morning the Vestris had a list of 25 degrees and that the estimated water from known sources would account for a list of only 21 degrees. However, if a reasonable margin of error be allowed in the estimates of the testimony as to the degree of the list at that time and the estimates as to the amount of water that entered through disclosed sources, the theory does not rest upon a very firm foundation. Particularly as the water entering the ship by the known sources could, it is conceded, have produced a list of 21 degrees and with this list the leaking half doors would almost entirely be submerged and would have brought the forward edge of the shelter deck almost to the waterline. This explanation, coupled with the testimony that the pipes were in good condition before the Vestris sailed, does not account for the gradual list which began around Saturday night when the weather was not sufficiently violent to cause good pipes to break and all these openings were well above the waterline. This theory also fails to explain the large amount of water in the firemen's passage, cross alleyway, and shelter deck 'tween bunker and other parts of the upper deck. It also appears unlikely that one of these larger pipes could have broken and discharged this large amount of water without some of the officers at least suspecting that this had occurred and investigating, but no one did. The conclusion that the incursion of the water was not due to one of these broken pipes is confirmed by the knowledge that both Second Engineer Forsythe and Third Engineer Blue had been on the Vestris on a previous trip when one of the pipes now referred to, a 5-inch toilet discharge pipe in the after cross bunker, did break and they immediately recognized where the water was coming from, and exactly what

had happened, and promptly took means to get at the pipe and repair it.

XX. I find that the sinking of the Vestris was due to a combination of causes including the fact that she was a tender vessel and overloaded, which reduced her buoyancy and stability, and which brought her defective openings nearer to the water allowing water to enter, the failure of the owners to notify her master of the necessity of which they were aware of keeping her bottom tanks filled and which were pumped out by him, and that the owners have not sustained the burden of showing the exercise of due diligence to make her seaworthy in these respects, nor have they established lack of privity or knowledge of these conditions, which certainly contributed to the loss. The owners therefore cannot avoid the consequences. The Edwin I. Morrison, 153 U. S. 199, 14 S. Ct. 823, 38 L. Ed. 688; Clark v. Barnwell, 12 How. (53 U. S.) 272, at page 280, 13 L. Ed. 985.

For the reasons above set forth, I find that the petitioners are liable for the losses resulting from the foundering of the Vestris, and that their petition for limitation of liability must be denied, with the usual reference to a commissioner as to damages. If the foregoing be deemed insufficient, compliance with Admiralty Rule 46½ Findings and Conclusions may be settled on notice.