THE CLEVECO.

THE ADMIRAL.

Petition of ALLIED OIL CO., Inc.

Nos. 3367, 3370, 3372.

District Court, N. D. Ohio, E. D.

June 28, 1944.

Lee Hinslea and Lucien Ray, of Duncan, Leckie, McCreary, Schlitz & Hinslea, all of Cleveland, Ohio, for applicants.

Silas B. Axtell, of New York City, Harry A. Gordon and Victor Todia, both of Cleveland, Ohio, and Edward Lamb, of Toledo, Ohio, for damage claimants.

FREED, District Judge.

The issues here presented for determination by this court arise out of three separate petitions, invoking the jurisdiction of the court, and seeking on behalf of its petitioner exoneration from and limitation of liability, under and by virtue of Title 46, § 183, § 184 and § 185, U.S.C.A., and sections amendatory of, and supplemental thereto.

The petitioners claim the protection of the exoneration and limitation statutes because of various suits instituted to recover for loss of life and damage to property arising out of the sinking of the Steamtug Admiral and its tow, the Barge Cleveco, upon the waters of Lake Erie on December 2, 1942, with all hands aboard.

In its petitions, Cleveland Tankers, Inc., as owner of the Steamtug Admiral and the Barge Cleveco, alleges as to each, that the sinking of the tug and barge was caused by the elements, and that both vessels were seaworthy in every respect, and properly manned, equipped and fit for the voyage they undertook at the time of their departure from Toledo, Ohio, for Cleveland.

The petitioner alleges further that the damage, loss and injury occasioned by the disaster were due solely to the severity of a storm of extraordinary proportions encountered by the vessels, and not attributable to any fault or negligence on its part.

In each instance the petitioner seeks judgment relieving it of any liability whatsoever for any loss, damage or injury arising out of the disaster; or, in the alternative, that should the court find the petitioner liable, then that the liability of the petitioner be limited to the value or amount of the petitioner's interest in the tug and barge, and the freight pending, if any, and that this sum be distributed pro rata among the various claimants, and, a decree discharging the petitioner from any and all further liability.

The Allied Oil Company, Inc., in its petition for exoneration from and limitation of liability, alleges substantially the same facts as are contained in the petitions of Cleveland Tankers, Inc., except that it denies any interest in the two vessels either as owner, or owner pro hac vice, and asks that the relief prayed for by the other petitioner be extended to it in the event that the court should find it to be either the owner, or owner pro hac vice.

Upon the petitions filed, and the applications for monitions and injunctions sought, the court entered orders: (1) Appointing a Commissioner to appraise the interest of the petitioners in the vessels in question, and (2) requiring the petitioners to pay into the registry of the court the sum so found by the Commissioner, and (3) issuance of monitions citing all persons to file with the Commissioner their proofs of claim and their answers in respect of the matters alleged in the various exoneration and limitation petitions, and (4) injunctions restraining the prosecution of any suits then pending or any proceedings then undertaken, and all future litigation arising out of, or resulting from the disaster.

As the result of the orders issued, the Commissioner reported claims in the aggregate sum of $1,065,000 filed as the result of the sinking of the Barge Cleveco; claims aggregating $1,100,000 arising out of the sinking of the Steamtug Admiral, and as against the Allied Oil Co., claims in the amount of $500,000. During the trial of this cause the court permitted the filing of two additional claims in the aggregate sum of $200,000 arising out of the sinking of the Steamtug Admiral.

The various claimants, in their answers, allege:

(1) That the Steamtug Admiral was unseaworthy at the commencement of the voyage, and was unfit for the service in which she was engaged by reason of her instability, resulting from alterations and additions to her superstructure.

(2) That the mean draft of the tug exceeded 11 feet, and that the tow line occupied a position other than in a line with the fore and aft axis of the tug.

(3) That the tug was not seaworthy for the purposes for which she was being used in that she had been built as an ice-breaker and harbor tug, and was unfit for towing service, particularly unfit and unseaworthy for the purpose intended in this voyage.

(4) That the tug was sent to sea, knowing its stability depended on the tug's maintaining its towline in a fore and aft position, and her draft not to exceed 11 feet, and when the petitioners knew a change in the fore and aft position of the towline would cause the tug to capsize.

(5) That the petitioner employed as master of the tug a person lacking in experience, and with no experience in navigation during winter weather.

(6) That the tug was sent to sea with an unseaworthy barge, with knowledge that the steering gear of the barge was not in good repair.

(7) That the tug was given sailing orders with knowledge that on previous occasions when the Admiral towed the Cleveco, the towing line had not been maintained in a fore and aft position, and that under calm weather conditions the Tug Admiral had tipped to the extent that her rail was under water.

The claimants ask that the court dismiss the petitions for exoneration and limitation of liability, and seek an award for damages.

The answer to the Allied Oil Company's petition alleges that by virtue of its stock ownership in Cleveland Tankers that it is the real owner of the vessels in question, or is owner pro hac vice.

The three cases, by stipulation, were tried together to the court. Many witnesses testified and numerous documents were introduced. The controversies were submitted upon the filing of voluminous briefs covering the issues raised in the many days of hearing.

The history of the two vessels in question is raised as an important issue in this case, and hence it is in point to discuss them.

It appears from the evidence that the Steamtug Admiral was built by the Manitowoc Shipbuilding Co. on order of the Milwaukee Tugboat Line. She was known, originally, as the W. H. Meyer, and was delivered in 1923. At the time of her construction an old power plant was installed in her, and she was outfitted with an engine of the size usually used in boats of that description for the purpose for which she was built.

It appears that she was built according to standard specifications of the American Bureau of Shipping, for use in harbor and lake towing, and that she was inspected by the United States Steamboat Bureau inspectors before delivery. During her years of service, the tug was returned to the Manitowoc yards frequently for minor repairs and painting. According to officials of the Milwaukee line, while they owned her, she was a seaworthy vessel and well maintained.

The testimony discloses that Cleveland Tankers became interested in the purchase of this vessel about April, 1942. The record shows the company had acquired the barge Cleveco sometime prior, and desiring a tug with which to tow her, made inquiry about this boat. The vessel was examined by Capt. Leif Jonassen, the acting manager, and at that time Marine Superintendent of Cleveland Tankers, and Gavin Drummond of Lloyd's Registry, in his private capacity as a marine architect. She was again examined the following month at Milwaukee, and upon the recommendation of Capt. Jonassen, it was decided to purchase the tug.

The Admiral was an 86-foot steamtug, drawing 12½ feet, with a 22-foot beam. To use her for the purposes for which Cleveland Tankers intended to employ her, it became necessary to make alterations to her superstructure and quarters, to enable her to carry a crew of 13 men. She was put into drydock in the yards of J. A. Hendrickson Co. and a set of plans was drawn detailing the work proposed to be done. The plans then were submitted to the Steamboat Inspection Bureau and approved by it. The plans contemplated cutting away the wheelhouse and moving it forward, raising it to make room for additional quarters; installing a shower and washroom, reconstructing the messroom, installing new refrigerating equipment, raising the smokestack and installing new life rafts and other equipment made necessary by the renovation of the vessel.

The repairs had the effect of raising the superstructure of the vessel, raising her center of gravity and adding to her weight approximately 19,000 pounds, more or less.

Government inspectors, representatives of Lloyd's Registry and officials of Cleveland Tankers were in periodic attendance during the time of reconstruction.

The record shows that after the repairs to the Admiral had been substantially completed, the United States Coast Guard, Marine Inspection Service, made a preliminary examination of the vessel and issued a temporary certificate of seaworthiness on July 23, 1942. After receiving the re-

port of the inspection, which resulted in the issuance of the temporary certificate, Capt. Thomas W. Gould, Merchant Marine Inspector in charge of the Merchant Marine Inspection Bureau in Cleveland, arranged a stability or inclination test.

The inclination tests were made, and the final and determinative calculations were embodied in a report of September 11, 1942, by Capt. Gould, and delivered to the owners of the Tug Admiral, which report set out the following conclusions:

"Examination of the foregoing data (stability data) indicates that the subject vessel is slightly deficient in stability and the following restrictions should be observed in the operation thereof:

"(1) Vessel should not be operated at a mean keel draft in excess of 11'-0" or at more than 2'-3" trim by the stern when at this draft.

"(2) Bilges should be maintained well pumped out.

"(3) Tow line should be maintained in as nearly a fore and aft line as practicable.

"If it is found impracticable in operation to limit the draft to 11'-0" the permissable draft evidently may be increased by building up the deck at the low point of the sheer so as to increase the depth at this point by at least the amount of the desired increase in draft. Plans for such alteration should be submitted for approval.

"James B. Robertson
"Naval Architect"

The Tug Admiral was put into service by Cleveland Tankers the day after receipt of the temporary certificate and from that date until the disaster, she and the Barge Cleveco operated as a unit.

During that period, as related by former members of the crew, the Tug Admiral nearly capsized in the Detroit River on an occasion when she was towing the Barge Cleveco. The testimony is to the effect that members of the crew were awakened by a sudden roll of the vessel when the barge sheered off at an angle. Testimony is that the crew hurried to the deck and disengaged the towing line which was tipping the tug, that the Admiral hung on her side for a moment, and then righted herself. There was, evidence offered with reference to the stranding of the flotilla.

There is a great deal of testimony in the record on the part of former members of the crew of the Admiral as to the incompetency of her master, leaking doors and portholes, sticking of freeing ports, water coming through into her hold, and the defective condition of the pelican hook which secured the tow line on the Admiral. Considerable evidence has been directed to the appearance of the pilot house after the alterations were completed. Claimants' witnesses stated that after the reconstruction of the Admiral, it was impossible for the wheelsman to keep the barge in sight and in full view without leaving the wheel, mounting a step and looking out a window at the rear of the pilot house; or otherwise, without leaving the wheel and stepping out of the wheel house entirely, and looking back from the deck. All this is contested by the officials of the company who inspected her periodically and challenge the accuracy of these statements, contending that she was seaworthy in all these respects.

The Barge Cleveco likewise was purchased by Cleveland Tankers after she had been in service for many years. She had been built at Lorain, Ohio, and was first known as the Socony 85. From the time of her delivery in 1913, until she was returned to the Great Lakes in 1935, she was employed in ocean tanker service. She was 260 feet long, drawing 24 feet, with a 43-foot beam. The Cleveco had been inspected annually by the steamboat inspectors. At the time of her purchase by Cleveland Tankers, in September, 1940, she had been dry-docked and had undergone repairs to put her in seaworthy condition. At the end of each succeeding shipping season she was dry-docked and completely renovated. In August, 1942, the Cleveco ran aground at Port Colburn and again was dry-docked for repairs to put her in seaworthy condition. She was examined after these repairs were completed and awarded a certificate of seaworthiness by the United States Salvage Association.

The tragedy that gives rise to the various claims this court is called upon to decide, has its origin in a voyage in which the Barge Cleveco, in tow of the Tug Admiral, loaded a cargo of oil which was to have been delivered to the Allied Oil Co. at its Cleveland docks.

Details of the manner of carriage were handled by Captain Jonassen, who as general manager of the company, was the official to whom all responsibility for the operation and maintenance of the fleet had been delegated. None of the other officers

was familiar with such matters, entrusting sole responsibility to Captain Jonassen.

As was the custom in such matters, Captain Jonassen communicated with Captain Smith of the Barge Cleveco, and instructed that the cargo was to be loaded.

The following day, on December 1, 1942, the cargo having been loaded, the tug and barge set out for Cleveland. A wire from Captain Smith advised Captain Jonassen that they had departed at 2:45 p.m.

It is undisputed that this voyage was made at a time of year when the Great Lakes were likely to be swept by sudden storms and hazardous of navigation because of high seas. It was the period of the equinoxial storms when experienced seamen on the Great Lakes know the weather is subject to constant and violent change. That is the usual weather experience of this season of the year.

Reports from the Toledo office of the United States Weather Bureau show there was comparative calm when the vessels departed Toledo. The bureau reported an eight-mile-an-hour wind blowing, although the testimony is that wind velocity, out in Lake Erie probably would run 20 to 50 per cent higher than that recorded at the station in Toledo.

The Barge Cleveco, which was equipped with a house radio, a ship-to-shore communicating system, had the means for keeping in touch with shore stations to determine what changes, if any, were taking place in the weather. The Tug Admiral had no communicating device of any sort and was dependent upon the barge's equipment for ship-to-shore messages.

The wind, on the afternoon of December 1st, began to rise slowly, but the Toledo weather bureau had no occasion to hoist storm warnings throughout that day. It was not until some time after 6:30 a.m., on the morning of December 2nd, that storm warnings were sent out.

There being no survivors of the tragedy, the court must rely upon the testimony of crewmen of other vessels which passed the flotilla, the ship-to-shore communications as related by Captain Jonassen, and the statements of tug men and Coast Guard officers who were dispatched to the rescue of the Barge Cleveco, to determine what happened to the tug and the barge as they proceeded to Cleveland through Southeast Shoals, in Lake Erie.

Two freighters passed the flotilla, one several hours before the tug foundered, and the other shortly before the disaster.

The master of the Steamer Marquette, who encountered the tug and barge shortly before the disaster, testified of some difficulty in getting his vessel out into the lake because of the heavy seas. It was his opinion that there was a gale blowing. However, the Marquette, headed for Port Arthur, light, finally got on her course and passed the tug and barge about 4:15 a.m. on December 2nd.

He heard the skipper of the Cleveco talking to the Lorain operator over the distress channel of the ship-to-shore communication system, and listened in when Capt. Smith attempted to fix his position. He heard Capt. Smith advise that no help was needed and that the barge was riding evenly. Hearing this, the Marquette made no offer of assistance.

It is evident from the testimony that he had overheard the first communication between the flotilla and shore after the Admiral and Cleveco had cleared Toledo harbor. The testimony discloses that this was the call that aroused Capt. Jonassen in the early-morning of December 2nd. The Lorain operator informed him that Capt. Smith was attempting to reach him over the ship-to-shore communication system.

Reception, according to Capt. Jonassen, was so poor because of the static that most of the conversation had to be relayed through the medium of the Lorain operator.

Capt. Smith informed Capt. Jonassen that the Tug Admiral had sheered off and that he had last seen the tug some five or six points off his starboard side, and that the tug had foundered.

Capt. Jonassen said there was some conversation about steering gear trouble, and he asked whether any of the men on the tug could be saved. Capt. Smith replied that the tug's crew had gone down with her and that he was unable to see any of the men in the water, and, therefore, had made no attempt to rescue anyone. He said his tow line was still fast to the tug.

Capt. Jonassen testified he asked Capt. Smith his position and that the barge skipper answered he was two miles off Avon Point. Capt. Jonassen told him he would send assistance immediately.

He notified the Coast Guard of the sinking of the tug and asked that assistance be sent to the barge, giving the Coast Guard the Cleveco's position as given to him by Capt. Smith. Immediately after that, Capt. Jonassen called an official of the Great Lakes Towing Co., informed him of the disaster and gave the position of the barge, and asked whether any tugs were available to tow the Cleveco to port. A few moments later he was informed that two tugs would be dispatched, one from Cleveland and the other from Lorain. He then requested Commander Rasmussen of the Coast Guard to take prompt steps to rescue the men on the stranded vessel.

The only mention made of the weather during the first conversation between Capts. Jonassen and Smith, and this after the tug had gone down, was a remark by Capt. Smith that there was a high wind and a heavy sea.

Capt. Jonassen, after making arrangements for rescue vessels, drove to the beach area off Avon Point with another employee of the company. Although they could see several miles out into the lake, they were unable to sight the barge.

About 9 a.m., Capt. Jonassen reached Capt. Smith over the ship-to-shore communication system. He informed Capt. Smith that he had been unable to see the vessel, and that evidently the barge was farther off Avon Point than Capt. Smith had believed. He requested that the barge captain give his position more accurately, to which Capt. Smith replied that he believed he was closer to Southeast Shoal than he previously had stated.

At that time he said visibility was decreasing because an arctic mist was settling and the seas were rising. He mentioned that he could see a tug approaching from astern. Capt. Jonassen replied that the tug probably was the one sent out from Cleveland to take him in tow. Capt. Smith said he was still fast to the tug which was at the bottom, and Capt. Jonassen instructed him to buoy the cable when he cut the line so that there would be no difficulty in locating the tug later on.

The next communication from Capt. Smith was about noon on December 2nd, when he informed Capt. Jonassen that he had cut loose from the tug in order to permit him to drop his second anchor without fouling the tug. He reported that a plane had been diving down toward him. A short while later Capt. Smith called again and said that the Coast Guard vessel, the Ossipee, was in sight, that the wind had increased appreciably and that there had been frequent snow squalls.

There was still another call in which Capt. Smith told Capt. Jonassen that he could see the Terminal Tower in Cleveland, and the chimneys in Gordon Park. This information was transmitted to the Coast Guard by Capt. Jonassen, but the Coast Guard vessels were unable to establish contact with the distressed barge thereafter. By the time the Coast Guard rescue vessel was able to go out again, the barge had gone down with her crew aboard.

During the interim between the first two ship-to-shore calls, vessels of the Coast Guard, one from Lorain and another from Cleveland, had gone to the rescue of the helpless barge.

The Ossipee left Cleveland about 8:30 on the morning of December 2nd, and the officer in charge of the vessel reported heavy seas, with a cross-sea running at the time. About three hours later the Ossipee reached the point where it was first informed it would find the barge. The Coast Guard contacted their Cleveland station and learned the Cleveco had been sighted some 10 miles away, and made for the new location. The barge was sighted about 1 p.m. and Lieut. Hanninon of the Coast Guard spoke with Capt. Smith over the ship-to-shore system. Capt. Smith reported the barge was not in danger, and that the 18 men aboard did not want to come off the vessel. By this time visibility was so bad that the Coast Guard crew, although their vessel was along side the Cleveco, were unable to see the barge. She remained along side the Cleveco for approximately half an hour and then lost contact with her. The Ossipee attempted to reestablish contact but was unsuccessful. She returned to base. The next morning she renewed her search, but by this time the Cleveco had gone down. The Coast Guard recovered a number of bodies of the crew.

The other Coast Guard vessel, a small motor life boat, had started in search of the Cleveco shortly after 5 a.m. on December 2nd. The chief boatswain testified that by the time the boat had reached the supposed location of the Cleveco, visibility was only 500 yards because of the vapor rising off the lake, and was steadily growing worse. The search went on for several

hours without success, and finally the weather got so bad that the skipper put the boat into harbor at Rocky River, rather than attempt the trip back to his station at Lorain.

The three tugs that went in search of the Cleveco were unable to locate her in the heavy seas with the poor visibility that prevailed at the time. The tugs returned to port and started out again that afternoon but had to turn back after an hour because of the heavy sea and fog.

■ In any discussion of the relative merits of the controversy between the parties it is well to be mindful of the clearly-expressed jurisdiction of the court in proceedings of this nature to do equity to claimants by affording a complete remedy regardless of limitation. It was said in Just v. Chambers, 312 U.S. 383, at page 386, 61 S.Ct. 687, at page 690, 85 L.Ed. 903:

"When the jurisdiction of the court in admiralty has attached through a petition for limitation, the jurisdiction to determine claims is not lost merely because the ship owner fails to establish his right to limitation. We have said that the court of admiralty in such a proceeding acquired the right to marshal all claims, whether of strictly admiralty origin or not, and to give effect to them by the apportionment of the res and by judgment in personam against the owner, so far as the court may decree. And that, if Congress has this constitutional power, it necessarily follows, as incidental to that power, that it may furnish a complete remedy for the satisfaction of those claims by distribution of the res and by judgments in personam for deficiencies against the owner, if he is not released by virtue of the statute."

See also: Hartford Accident Co. v. Southern Pacific Co., 273 U.S. 207, 47 S. Ct. 357, 71 L.Ed. 612; The City of Norwich, 118 U.S. 468, 6 S.Ct. 1150, 30 L. Ed. 134; Butler v. Boston & S. Steamship Co., 130 U.S. 527, 9 S.Ct. 612, 32 L.Ed. 1017 and 1 Benedict's Admiralty, Fifth Ed., 488.

■ One of the suits here under consideration is the petition of the Allied Oil Co., Inc., In Admiralty, No. 3372. The evidence is so conclusive that the petitioner was neither the owner of the vessels which are lying at the bottom of Lake Erie, either in fact or pro hac vice, as to make it purposeless to discuss the matter. Mere ownership of stock of Cleveland Tankers by Allied Oil does not, of itself, create liability. The petition for limitation, as well as the claims against the Allied Oil Co., Inc., will be dismissed.

In the trial of the case the petitioners maintained that regrettable as the loss of life in the disaster of December 2nd may be, the record justifies complete exoneration. They urged that the "perils of the sea" were responsible for the loss of life. Breach of a duty, they said, is the sole basis of liability; which duty was discharged. In arriving at their conclusion, petitioners set forth numerous issues which require determination by the court. It is asserted by them that there is no mandate of law to the effect that there was a warranty of seaworthiness, violation of which creates a liability; but, on the contrary, that the claimants may not recover unless the ship owner's negligence, and its causal relation to the disaster are established. They affirm that such negligence was not established.

It is argued by the petitioners that even if the Admiral and Cleveco, or either of them, were not seaworthy on breaking water for the planned voyage from Toledo to Cleveland on December 1st, that it was clearly proved that due diligence was exercised to make them seaworthy; that whatever caused the sinking was not within their privity or knowledge. That being so, the law gives them the right to complete exoneration. It is pointed out that the claimants' causes of action arise under the Jones Act, 46 U.S.C.A. § 688, which act requires proof of negligence as a basis for a right of recovery.

The claimants pointedly assert that the law provides a warranty of seaworthiness, the breach of which creates liability; that the evidence failed to establish that the vessels were seaworthy; that, in fact, their unseaworthy condition was conclusively proved. It is urged by the claimants, by inference, in seeking to establish their right to recover, that even if there is no warranty of seaworthiness under the law, the negligent failure of the ship owners to place seaworthy vessels in the hands of the crews was definitely shown. They vigorously deny that the sinking and resultant loss of life could be attributed to the perils of the sea.

■ Seaworthiness of a ship has been defined repeatedly by the distinguished and learned Admiralty judges of the courts. It is evident from these definitions that

seaworthiness is a relative term. A ship which may be seaworthy on the Great Lakes may not be seaworthy for an ocean voyage. A seaworthy boat sailing the Mississippi or Ohio Rivers may not be seaworthy to withstand the hazards of the Great Lakes. Generally it is that strength, durability and engineering skill made a part of her construction and continued maintenance, together with a competent and sufficient crew, as would withstand the vicissitudes and dangers of the elements which might reasonably be expected or encountered during her voyage without loss or damage to her particular cargo.

In the case of The Silvia, 171 U.S. 462, 19 S.Ct. 7, 8, 43 L.Ed. 241, Mr. Justice Gray said: "The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport." Also see: The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65; Spencer Kellogg & Sons v. Buckeye Co., 6 Cir., 70 F.2d 146, at page 148.

The claimants in effect contend that the multifarious perils and hazards of the sea, and the inherent dangers to which men who follow the sea subject themselves by their very calling, have evoked the common law principle that it is mandatory upon the ship owner to furnish a seaworthy vessel and safe and seaworthy appliances, and point to: Sabine Towing Co. v. Brennan, 5 Cir., 72 F.2d 490, 494, where Judge Hutcheson says:

" 'The duty of ship owners to their seamen to see that their ship is seaworthy and her equipment in safe condition for use when she starts on a voyage is a personal one, responsibility for which they cannot escape by delegating its performance to another. In this respect it is like the common-law duty of a master to provide his servant a suitable place in which to work. And a seaman injured through failure to perform this duty is entitled to compensation.' Christopher v. Grueby, 1 Cir., 40 F.2d 8, 12.

"This duty, as to injuries, for which the general maritime law provides recovery, is absolute. Its breach without regard to negligence makes the owner liable for such losses." (Citing cases.)

It is here urged by the petitioners that notwithstanding the common law duty to furnish a seaworthy vessel, that no right of recovery accrues to the next-of-kin or representatives of a mariner who loses his life as a result of a mishap occasioned by the unseaworthiness of his vessel, unless it can be established that the owner was negligent in failing to furnish a seaworthy craft.

The claimants argue the ship owner cannot relieve himself of liability by showing he used due diligence to make the vessel seaworthy, and that it is the failure to furnish a seaworthy vessel and not the failure to use due diligence to make it seaworthy, that is the basis for the right to recover. It is their contention that the Jones Act has not changed that principle nor modified in any respect the vessel owner's common law duty which is absolute, and that it is the breach of the duty to furnish a seaworthy vessel that constitutes the negligence contemplated by the Jones Act.

■ Despite the lengthy discussion of this problem, it is only of academic importance in resolving the conflicting views of the parties on this question under the facts of this case. The court, limiting itself strictly to the narrow construction urged by the petitioners in this case, upon the facts established by the proof, comes to the inescapable conclusion that the petitioners were guilty of negligence in failing to use due care to supply a seaworthy vessel.

Even if all other contentions and allegations of negligence, alleged and sought to be proved by the claimants here, were disregarded by the court, the liability of the petitioners attaches by virtue of the proof in the matter of the instability of the Tug Admiral. The testimony in this case established the petitioners, after the repairs to the Admiral were substantially completed, ordered an inclination test made to determine the stability of the vessel. The full report of the findings are a part of the record in this case, and the conclusions reached by the United States Coast Guard are set forth in full in the foregoing part of this memorandum.

The results of this stability test were placed in the hands of responsible officials of the petitioning ship owner. In the judgment of this court, it was absolute notice to the petitioner that the vessel was lacking in stability, and because of the limitations restricting its operation, was a warning that the Admiral should not be operated on the Great Lakes during the period of equinoxial storms. Upon this conclusion the testimony of the experts is uncontradicted.

Henry C. Adams, associate professor of naval architecture and marine engineering at the University of Michigan, leaves no doubt on this score. He performed inclination tests on the Leviathan, the New York, Philadelphia, St. Paul, Kronland and Feisland when these ships were reconditioned after the last war. He served as technical aide to the Special Committee on Loading and Stability of the American Marine Standards Committee. This is the committee which set up the standards for the Government Steamboat Inspection Service for use of naval architects, and are the very standards which were employed to determine the stability of the Tug Admiral.

He testified he had examined in detail the calculations which were contained in the stability report of the Admiral, in evidence in this case, and that in his opinion the metacentric height was entirely inadequate for a vessel of the type of the Admiral and rendered her unseaworthy for the purposes for which she was used in the waters in which she operated. He testified that he had read the conditions that were attached to the certificate of stability, and upon cross-examination was asked:

"Q. Now, Professor, you have read the conditions that were attached to this certificate of stability? A. Yes, sir.

"Q. They are not difficult to comply with, are they? A. Well, the only thing I should say is the difficult thing to comply with, that practically voided the certificate for this vessel, was No. 3.

"Q. That is, keeping the line fore and aft? A. Yes, sir.

"Q. And that would only be difficult to comply with when a tug was going around a bend in a river or coming into a harbor? A. I should say it would be difficult to comply with at any time in any kind of heavy weather.

"Q. Can a barge keep behind a tug in heavy weather? A. I am not a seaman, but I should rather infer that you would have to count on a certain amount of divergence from a true follow on the part of the barge.

"Q. Of course, this restriction says 'whenever practicable?' A. Well, that is true but it is a little more vigorous than that."

And, further in his cross-examination, Professor Adams was asked:

"Q. Now that certificate is an operating certificate, is it not? A. I suppose so, yes.

"Q. You wouldn't say any of those restrictions voided the certificate? A. I would say that it put the owners very definitely on warning.

"Q. Warning of what? A. Of a dangerous vessel, a vessel to be handled with kid gloves in the utmost care."

Professor Adams' views were substantiated by George B. Hargan, a marine surveyor with a less imposing educational background, but with a record of long practical experience in the field of marine engineering. He, too, after examining the data contained in the stability report of the Admiral, came to the conclusion that she did not have sufficient stability even for quiet harbor operation after the alterations to her superstructure, much less for duty on the Great Lakes after the equinoxial storms set in.

Nor is the testimony of these experts controverted by that of George C. Manning, professor at Massachusetts Institute of Technology and a teacher of naval architecture and ship design at that institution, called on behalf of the petitioners. Although it was his opinion that the metacentric height of the Admiral did not render her unstable and unseaworthy, and that in his opinion she was overwhelmed by the sea, he concluded his testimony with the statement that all his conclusions were predicated upon the premise that the vessel was being operated in strict accordance with the restrictions embodied in the stability certificate. This premise, according to Professor Adams, was unwarranted, and in this conclusion the court concurs.

The petitioners have introduced several inspection certificates upon which they rely heavily for proof of the seaworthiness and stability of the Tug Admiral. Mere inspection certificates, giving the vessel the right to sail, cannot overbalance definite notice of instability. These certificates, issued by government inspectors, may constitute some evidence of the seaworthiness of a vessel but they are no more than that.

In the Sabine case, supra, Judge Hutcheson considered the same question and found:

"The inspection certificates on which the appellant relies so strongly are of course evidence bearing upon the question of due

care, but they are not more. The R. P. Fitzgerald, 6 Cir., 212 F. 678; The Vestris, supra [D.C., 60 F.2d 273]; The Viking, 6 Cir., 271 F. 801, 804; In re Reichert Towing Line, 2 Cir., 251 F. 214; O'Connor v. Armour Packing Co., 5 Cir., 158 F. 241, 249, 15 L.R.A.,N.S., 812, 14 Ann.Cas. 66."

The most that can be said for these inspection certificates, under the proof in this case, is that they were temporary and qualified certificates of seaworthiness that were, as Professor Adams put it, "virtually voided" by the qualifications embodied in the final stability report.

This report was unequivocal and positive notice to the shipowners that they had an unstable vessel, in Professor Adams' words, "one to be handled with kid gloves in the utmost care."

■ To dispatch such a vessel on a voyage, with notice of the defects in her stability, at a time when, according to the uncontradicted testimony, it would have been difficult, if not impossible, to navigate her in accordance with the prescribed conditions permitting her operation, was such negligence on the part of the owners as to render them liable in personam for the loss or damage resulting from such negligence.

Upon the facts in this case, it is the considered judgment of this court that the sinking of the Admiral and the loss of life and property resulting from it, are directly attributable to the deficiency in her stability and her resultant unseaworthiness.

There are several other specifications of negligence and unseaworthiness alleged, as to which considerable credible testimony was offered, but in view of the conclusive character of the determination on the matter of instability and the resultant unseaworthiness of the Tug Admiral, the court believes it would burden the record to discuss them or elaborate upon them.

Testimony in great volume was introduced with respect to the condition of the Barge Cleveco, the damage she suffered in stranding, as to her steering gear, all directed to the question of whether she was or was not seaworthy at the time she undertook the fateful voyage in tow of the Admiral. Much evidence was offered in order to prove the alleged incompetency of her master, and his inability to give an accurate description of his location after the tug went down. Great importance was

attributed to the conversations between Capt. Smith and Capt. Jonassen, in an attempt to show the owners assumed full responsibility for her operation, and had knowledge of her condition as she lay helpless at the mercy of a rising storm.

None of this proof is controlling because of the other determining factors in this case.

■ The Tug Admiral and the Barge Cleveco, for the purpose of the contract which dispatched them on their voyage on December 1st, were a single unit. It has been held repeatedly, in cases arising chiefly under the Harter Act, 46 U.S.C.A. § 190 et seq., that where barges without motive power of their own, are used in connection with a tug for the purpose of transporting a cargo, the two are to be considered one vessel for the purpose of the voyage.

This was the decision of the Supreme Court in Sacramento Nav. Co., v. Salz, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663; cf., The Civilta, 103 U.S. 699, 26 L.Ed. 599.

In The Columbia, 9 Cir., 73 F. 226, 238, Judge Ross, speaking for the Ninth Circuit, said:

"The court below held that the collapsing of the barge was occasioned by the negligent shifting of some sacks of wheat by the master of the barge, and that that act of his was the proximate cause of the loss and damage in question. But no question of proximate cause, we think, arises in the case, for the reason that the tug and barge are, in law, considered one vessel, for the purpose of the voyage in question, and, whether the accident giving rise to the loss and damage be directly attributable to the acts of the master of the barge, or to those of the master of the tug, it is equally the negligence of the carrier, for which it contracted to be liable. It results that, in according the petitioners a limitation of liability without the surrender of the tug Ocklahama, the court below was in error."

The cases cited by the petitioners, involving collisions between tug-and-tow and other vessels, dealing with the matter of surrender of both the tug and tow, where one has been the "offending" instrumentality in the mishap, have no application to the issues presented here.

■ The question here is whether the owner's negligence in failing to use due care to furnish a seaworthy vessel in re-

spect of one part of a single unit of transportation, is such negligence as would render the shipowner liable for mishap to either part of the unit, or to the whole entity, should it be established that such negligence was the producing cause of the loss or damage sustained by either or both. Upon this proposition, the court is of the opinion that the shipowner's liability extends to the entire flotilla, if it can be established that it was negligent with respect to any part of the unit, and that such negligence produced the injury or damage proved to have been suffered.

■ Thus, with respect to the Barge Cleveco, it is a matter of determining what caused her to go down. The barge had no motive power of her own. She was heavily laden. She was entirely dependent upon the Tug Admiral to move her out of the path of any peril that might beset her, and this is acknowledged by the petitioners as well.

The evidence in this case firmly establishes that at the time the Tug Admiral foundered, the weather and the seas were such as might reasonably be expected on the Great Lakes during the period of the equinoxial storms. But shortly afterward, storm warnings were hoisted, an arctic mist settled and the wind increased in intensity. Before the rescue vessels were able to bring effective aid to the Barge Cleveco, she was overwhelmed by the elements.

The proof in this case leaves no doubt but that for the unseaworthiness of the Tug Admiral, the flotilla could have reached a haven of safety at her port of destination in Cleveland. Helpless, without motive power of her own, the Barge Cleveco was at the mercy of the gale that ultimately destroyed her.

The unseaworthy condition of the Admiral, which resulted in her sinking in the middle of Lake Erie, having been established, the liability of the shipowner to respond in damages to the next-of-kin and representatives of those who lost their lives on the Cleveco does not differ materially from what would have arisen had the Tug Admiral towed the Barge Cleveco to the middle of the lake during that season of the year, and abandoned her without any motive power of her own, to the destructive elements and perils of the sea.

It is the position of the petitioners in this case that the evidence supports the conclusion that the vessels were lost to the perils of the sea, and went down because of the intensity of the storm that overwhelmed them.

■ What is a "peril of the sea" has been the subject of many judicial interpretations, but most of the authorities agree that the weather, to reach proportions that would absolve owners of liability for injury or loss, must be "irresistible, overwhelming, and extraordinary for the particular time of year to be a good exception and not a common occurrence at that season of the year." The Manual Arnus, D.C., 10 F.Supp. 729, 732.

Judge Hough (The Rosalia, 2 Cir., 264 F. 285, 288) defines "perils of the sea" as "something so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port and safety."

The claimants draw a parallel between the facts in this case and those in The Colima, D.C., 82 F. 665, 672, in which Judge Brown said:

" * * * The question here is not whether there was a brief cyclone or whirlwind in the squall that arose after the ship sank, but what was the weather up to the time she went down. Up to that time, no incidents are mentioned analogous to those occurring afterwards, nor anything suggesting a whirlwind, hurricane, or cyclone, as that word is ordinarily understood. The weight of evidence is that when the ship went down the storm was 'but little more than an ordinary gale,' 'nothing that a vessel like the Colima ought to take any notice of.' "

■ It is evident from the testimony concerning the events here in question, that the weather, at the time the Tug Admiral went down, was not of extraordinary proportions. It had not, at that time, even reached gale proportions, which, according to all the testimony, was such weather as could ordinarily be expected during that season of the year on the Great Lakes.

The only witness who volunteered the statement that the weather had reached extraordinary proportions was the master of the freighter which passed the helpless barge just about the time the tug foundered and sank. And this witness testified he overheard the conversation in which the captain of the barge reported he felt no concern over the weather and that the barge, at that time, was in no danger from.

the elements. The witness, himself, was unconcerned enough about the weather at that time, to turn in for a nap.

The testimony convinces the court, beyond any question, that the weather did not reach extraordinary proportions until some time after the tug went down.

It is the conclusion of this court that no credible evidence supports the position of the petitioner that the tug went down as the result of the perils of the sea, although the storm which followed her sinking, without doubt, did overwhelm the barge.

A court may well reach the conclusion that the loss of the vessel or vessels were due to the perils of the sea when, prior to their breaking water there were no known defects in their condition and they were properly outfitted and manned, and where there remain no survivors to testify as to the cause of their demise; but when those in responsible position are told that the craft is slightly deficient in stability and must be operated under certain prescribed conditions, the sinking may not be peremptorily dismissed by accounting for it as a casualty of the perils of the sea.

When the owners sent an unseaworthy tug to tow a barge without motive power on such a mission, and as a result of the unseaworthiness of the tug she was lost, and the helpless, powerless barge was left to the mercy of the elements which destroyed her, it follows that both vessels were lost as the result of the unseaworthiness of the tug.

Therefore, it is the opinion of this court that the petitioners are not entitled to exoneration or to limit their liability, and must respond in damages for the resultant injury, damage and loss of life.