## THE BESSIE J.

(District Court, D. Massachusetts.    August 19, 1920.)

No. 1714.

Shipping ⬅️208—Owner of barge, sunk because not properly manned, held guilty of personal fault and not entitled to limitation of liability.

A barge was improperly loaded under direction of her master, so that during the night she sprang a leak and sank at the loading wharf in the port of Boston. The leak could have been controlled, if seasonably discovered; but the master left the barge, on which he was the only man, unattended during the night. The owner of the barge had given orders that barge captains were to remain on board at night, when away from the home dock; but it had no system of following them up to see that the order was obeyed, and it had reason to believe that its barges were frequently left unattended at night when lying at Boston wharves. An action was brought by the dock owner against the barge owners to recover damages due to her sinking. *Held*, that the barge owners were not free from personal fault for the unmanned condition of the barge, and were not entitled to limit their liability.

In Admiralty. Petition of the Boston Towboat Company for limitation of liability as owner of the barge Bessie J. Petition denied.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for petitioner.

Alexander Wheeler, of Boston, Mass., for claimant.

MORTON, District Judge. This is a petition to limit liability brought by the Boston Towboat Company as owner of the barge Bessie J., which, by sinking on March 6, 1917, at the wharf of the Darrow-Mann Company, the damage claimant, in Boston, blocked the slip and caused damage. There is a cross-libel by the Towboat Company to recover damages from the Darrow-Mann Company for alleged improper loading. The facts are as follows:

The Bessie J. was a schooner built in 1879, acquired by the petitioner in 1912, and reconstructed as a barge. In 1914 and in 1916 repairs of rather extensive character were done to her. Batchelder Bros. hired her from the petitioner to take a cargo of coal from the Darrow-Mann wharf, where it was to be loaded. The Darrow-Mann Company had nothing to do with the hiring; their only connection with the barge was to load her for account of Batchelder Bros. The barge was placed by the petitioner at the damage claimant's dock about 3 p. m. on March 5, 1917. She was in charge of Capt. Pendleton, who was hired by the petitioner and seems to have been a competent man, as far at least as knowledge and experience went. Pendleton staid on board the Bessie J. until 5 o'clock that afternoon, when the day gang stopped work on the wharf. Up to that time about 175 tons had been loaded, most of it in the two or three after hatches. Pendleton then left for the night, and the work of loading was suspended until resumed by the night gang an hour or two later. At that time there was nobody in charge of the barge. The Darrow-Mann workmen went ahead, however,

and loaded her with the stipulated amount, which was less than her carrying capacity, putting it into the hatches forward of those previous-ly loaded. The loading was finished about 9 p. m. For the rest of the night the barge lay at the Darrow-Mann wharf under observation of its watchman, who looked at her from time to time and noticed nothing wrong with her. About 6:30 the next morning the tug French, belong-ing to the petitioner, arrived at the wharf to move the barge out. Pen-dleton came over on the tug, having boarded her at the petitioner's wharf. They found the barge in a sinking condition, her after deck awash. She shortly went down stern first at the wharf.

Of course, there is no right to limit liability unless the vessel was seaworthy and reasonable care was exercised by the owner to see that she was properly manned, equipped, and supplied. Eastern S. S. Co. v. Great Lakes D. & D. Co., 256 Fed. 497, 168 C. C. A. 3. Nor is there any question but that a partially loaded vessel ought not to have been left to lie through the night with no one on board. See The Scotia, 6 Asp. M. C. N. S. 541; The On-the-Level (D. C.) 128 Fed. 511. The real issues are (1) whether the Bessie J. was seaworthy; (2) whether the Darrow-Mann Company was negligent in loading her; and (3) whether the petitioner exercised reasonable care to see that she was properly manned.

As to seaworthiness: The history of the Bessie J. is not such as to inspire confidence in her soundness. She was old; she had been wreck-ed and rebuilt; she had sunk and been raised; she had leaked and been repaired. But the petitioner had a competent inspection and repair force, and she seems to have been well looked after and kept up. Her owners recognized that it was not safe to subject her to any great strain, and used her only for harbor purposes and an occasional trip, presum-ably in good weather, as far as Lynn or Gloucester. The evidence as to whether she was recognized as a leaky vessel is conflicting. The fact very likely is that from time to time she had developed leaks when loaded which had been repaired when she was light. The evidence for the petitioner is that the barge was tight when placed at the Darrow-Mann wharf. Nothing happened to her during the night. Various wit-nesses testify that it was improper to load 175 tons into the after hatches without putting any load into the forward hatches, and that to do so would be very likely to strain the barge and start a seam or butt, which would cause her to leak. She was either in a leaky condi-tion when placed at the wharf, or she was injured during the loading in the way stated. I think that the weight of the evidence supports the latter alternative; and I so find.

At the time when the Bessie J. was placed at the wharf, she was, for the limited purpose for which she was in use, seaworthy. She was equipped with a pump of sufficient capacity to have easily controlled such a leak, if it had been seasonably started. The failure to operate the pump due to the absence of Pendleton, was the proximate cause of the accident.

As to loading: The loading was, as far as the barge was concerned, under the control of her master. It was his business to direct where cargo should be placed, so as to keep her in proper trim and avoid

straining. The loading which occasioned the strain was done before 5 o'clock, during the time when Capt. Pendleton was on board; and on Noel's testimony it was done according to Pendleton's instructions. The responsibility for it therefore does not rest on the Darrow-Mann Company. The night gang loaded according to instructions from Noel, who passed along what he had received from Pendleton. The Darrow-Mann Company was not negligent in loading the barge.

As to the manning: Some time before the accident Mr. Page, general manager of the petitioner, had given explicit orders that men should at all times be kept on barges which were away from the home dock, and its insurance policies contained a warranty which in effect required that to be done. This order was known to Pendleton. The petitioner did not, however, pay additional wages for night duty nor hire additional men for that purpose. It had no system of following up its barge captains to ascertain whether they stayed on board at night, and it took no steps to see that Mr. Page's order was obeyed. Barge captains are as a class rather unreliable, and it was easy for them to leave their vessels when lying at wharves in Boston or nearby harbors. Some of the barges had no living accommodations, although this was not true of the Bessie J. Under such circumstances, disregard of the order was to be expected, and was undoubtedly of frequent occurrence.

It was the petitioner's duty to exercise reasonable care and diligence to see that its vessels were at all times properly manned. The rights or property of others might be endangered by a failure in this respect. It employed a very competent manager for its fleet, Capt. Nickerson, who had full charge and control of its vessels under the general supervision of its vice president, Mr. Page, and its board of directors. The actual management of the vessels, so far at least as their manning, equipment, and supply went, was left entirely to Capt. Nickerson. He hired or caused to be hired a competent man (Pendleton) to take charge of the Bessie J., who seems to have understood the requirements of his position. There does not appear to have been any failure to give adequate instructions.

Generally speaking, this would discharge the owner's personal duty as to manning. The petitioner's fleet manager knew, however (or should have known), that, notwithstanding instructions to the contrary, its barge captains, not being followed up, were likely to leave their vessels at night when in Boston.

There is direct testimony by two witnesses that after 5 o'clock Pendleton said to them that he was going to telephone to the office of the petitioner, and report the condition of the barge as to loading, and ask whether he should stay on her, and that he returned shortly after, saying he had done so, and had been told not to stay. Another witness not now connected with the Darrow-Mann Company testifies that Pendleton told him the same thing the next morning after the barge had sunk. All this testimony is doubted by the petitioner; but it is clear that its tug French received orders to take the barge out early enough the next morning to make the 7 o'clock opening of the draw, and that Pendleton knew of this arrangement and boarded the tug at the petitioner's wharf to come to the barge.

The petitioner has offered no evidence as to how it learned that the barge would be ready to be moved in the morning, or came to give the order to the tug to move her, or how Pendleton came to be on hand when the tug left its wharf. These facts are wholly unexplained, if the testimony as to Pendleton's statements about telephoning be rejected. There was nothing in the appearance of the witnesses which led me to believe that they were lying. Pendleton's action in coming over on the petitioner's tug in the morning shows that he was not conscious of having left his post in violation of orders; nor was he accused of having done so immediately after the accident. He is dead, and his knowledge of the facts is lost; it is easy to suggest that he was derelict in his duty. I find that Pendleton made the statements attributed to him, and telephoned as he said he did. Who the person was to whom he telephoned is absolutely undisclosed. As Pendleton had been working for some years for the petitioner, and must have been familiar in a general way with its organization, it is fair to assume that the person was one whom he understood to have authority to deal with such matters. That the permission came from a person for whose act the petitioner would be personally responsible is not established. But the fact that such permission was given at the petitioner's office lends support to the view that Page's order to keep men on the barges at all times was customarily disregarded in the actual operation of the vessels, and that Capt. Nickerson had reason to foresee and expect the condition of things which actually existed; and I so find.

While the question is by no means free from doubt, it seems to me that, under the peculiar circumstances here shown, the petitioner or its managing officers, for whose conduct in this matter it is personally responsible, did not exercise reasonable care and diligence to see that the Bessie J. was properly manned at the time in question, and that it was not without privity or knowledge of the unmanned condition to which her sinking was ultimately due; and I so find.

There must accordingly be a decree denying the petition for limitation of liability and dissolving the injunction against the proceedings in the state court.