## GIGER v. NEW YORK, N. H. & H. R. CO.
### No. 408.

Circuit Court of Appeals, Second Circuit.
July 5, 1932.

Clark & Davis, of White Plains, N. Y. (Alfred M. Bailey, of White Plains, N. Y., of counsel), for appellant.

John M. Gibbons, of New York City (E. R. Brumley, of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

Giger, the plaintiff, was a passenger on the defendant's railroad. On the morning in question he boarded a commuters' train at New Rochelle, a suburb near New York, and finding no seats, stood in the vestibule of the coach, at the rear end on the left side. The vestibule was of a common kind; the steps leading to the platform were covered by movable plates, making a flooring with the platform proper from side to side of the car, on which passengers might stand. There were doors at either side which slid into the body of the car, and when shut, made a closed compartment, safe to stand in. Giger stood in this space with one or two others, leaning with his back against the rear of the car, his left arm and shoulder about two inches from the door. The train came into the Grand Central Station in New York and his car, the third from the front, was already opposite a part of the platform on which passengers were to disembark, though still moving at a

substantial speed, estimated at twenty miles and more, though probably in fact a good deal less. In some way not known, at this moment the door beside him opened without warning, and he was thrown between the car and the platform, suffering severe injuries for which he sued. At the same time that his door opened, the left-hand door of the forward vestibule of the car behind him opened also. There was no guard between the cars. These doors open and close automatically, the mechanism being controlled by buttons set in a box on the outside of each car at its end; of these there are four, one to open, one to shut, the door on either side. The box is within reach of any one standing between the cars; it has no cover and by pressing the proper button the desired door can be opened by any one who knows which to select. The practice is, when the train stops, for a guard, stationed between the cars or coming up later, or for a porter from the platform, to press the proper buttons and release the passengers. There was a notice in each vestibule forbidding passengers to open the doors.

On the morning in question the train was very crowded and the train crew—though as many as the law required—was not enough to man each interval between the coaches. The inference is inevitable—considering that the doors of two adjacent cars on the same side opened at the same time—that some unauthorized and officious person, knowing the proper buttons to press, opened both. There was no evidence that the mechanism was defective, and a jury would not be justified in finding that it was; but Giger's argument is that it was negligent to leave the buttons accessible when the train was coming into the station; at least that this is certainly true, when it was crowded with commuters coming in for their work in the morning. He maintains that quite aside from any notice to the road of unauthorized interference with the buttons, the arrangement was so inherently liable to abuse that the railroad should not have allowed it. In addition he proved that the road had in fact been put on notice that passengers had the habit of opening doors after the train had come to rest, if no guard was present to release them. Two of his witnesses, passengers, said that they had seen this happen; four of the road's employees, called by it, had either seen it, or had found the doors open when no attendant was near by; one had actually prevented passengers from pressing the buttons. However, nobody had known of this, while the train was in motion.

The Judge thought that, as there was no evidence that the mechanism was out of order, it was beyond those dangers which a carrier was bound to anticipate that a passenger would interfere at such a moment, and that no question was open for the jury. Therefore, at the close of all the evidence he directed a verdict for the defendant, from the judgment on which the plaintiff appeals. We agree so far as the mechanism itself is concerned, but it seems to us that the case was one where the jury must set the appropriate standard of care. The duty to protect others from injury is the resultant of several factors; the gravity of the injury if it happens, its likelihood, the interest one has in the venture, its public importance. So when the enterprise is socially desirable, one may be excused though there may be a high actuarial risk of serious injury. For example, one may undertake the construction of a large building, though with every care some one is almost sure to be killed or injured before it is completed. A carrier of passengers has indeed an important public function, and a lawful personal interest in his calling; so far as concerns those whom he does not carry, these excuse injuries which might be avoided, if he were extravagantly farsighted. But his very enterprise is to carry passengers safely, and he is bound to a much longer forecast of the dangers which surround them than he is as regards strangers. It is not perhaps important in just what terms this duty is measured; usually they include the "highest human foresight" possible in the circumstances. Stokes v. Saltonstall, 13 Pet. 181, 191, 10 L. Ed. 115; Indianapolis, etc., R. R. v. Horst, 93 U. S. 291, 295, 296, 23 L. Ed. 898; Gleeson v. Va. Midland R. Co., 140 U. S. 435, 443, 11 S. Ct. 859, 35 L. Ed. 458; Pennsylvania Co. v. Clark, 266 F. 182, 188 (C. C. A. 6). It is enough that the law exacts from him a solicitude which would be unnecessary, and indeed undesirable, in most enterprises. We are not therefore to measure what the defendant should have foreseen by ordinary standards; the law imposes on him a meticulous regard for possibilities which should ordinarily be ignored.

The road's employees confessedly had notice that passengers could, and did, open these doors after the train came to a stop; that they disregarded the legend, and refused to wait. It seems to us that a person, alive to the possibilities, might well have gone further, and asked himself whether this might not also happen before the train did stop, and whether that was not a risk which should be

prevented, either by covering the box, or having a guard to protect it just then. A half-grown boy, and many supposedly mature men, would find in such a feat a chance not only to save a moment of their precious time, but to attract the attention of other passengers to their sophistication. We agree that it might be unreasonable to expect such a thing while the train is under way between stops; but we think otherwise when the end of the trip is at hand, and no attendant is there to release the passengers. Every one is tempted to leave moving vehicles, though again and again warned of the danger; most of us do it. The extent to which a carrier must forecast such impatience seems to us to be a matter on which reasonable men might differ; it was a jury question.

No decision which we have found is close enough to be of much assistance here. Perhaps the nearest is Sure v. Milwaukee E. R. & L. Co., 148 Wis. 1, 133 N. W. 1098, 37 L. R. A. (N. S.) 724, Ann. Cas. 1913A, 1074, where a passenger was injured by another who released a brake. But there the road had had no notice that passengers had deliberately released the brake before, though they had played with it. Moreover, it would have been preposterous to station a guard permanently at each brake. Bronson v. Oakes, 76 F. 734 (C. C. A. 8). comes a little closer. In Boston & Maine R. Co. v. Stockwell, 146 F. 505 (C. C. A. 2), and Olivieri v. Hines, 271 F. 939 (C. C. A. 3), the guard opened the gate, or failed to close it; they do not help the plaintiff. In McDonough v. Third Ave. R. R. Co., 95 App. Div. 311, 88 N. Y. S. 609, it is difficult to see how the starting cord could have been protected against passengers; to some of the language used we should hesitate to assent. In McDonnell v. N. Y. Central & H. R. R., 35 App. Div. 147, 54 N. Y. S. 747, the facts were not materially different from McDonough v. Third Avenue R. R. Co. Ferry v. Manhattan Ry. Co., 118 N. Y. 497, 23 N. E. 822, is equally remote. Had it been shown that there was a general practice among railways to leave the controls accessible to passengers and unguarded at stops, more might be said for the defense. Nothing of the sort appears; for all we know other roads running crowded trains so fitted positively prevent the exit of passengers until the train comes to a stop. We are presented with the situation as res nova; we can have recourse only to such light as our own experience offers.

Judgment reversed; new trial ordered.