## THE BIG CHIEF.

### In re TAYLOR et al.

### No. 1145.

District Court, E. D. Missouri, S. E. D.
Jan. 26, 1948.

498

Ward & Reeves, of Caruthersville, Mo., for petitioners J. E. Taylor et al.

Fred L. Henley and Von Mayes, both of Carruthersville, Mo., for claimants Mary S. Green et al.

Robert M. Nelson, of Memphis, Tenn., for Claimant State Farm Mut. Automobile Ins. Co.

Jack O. Knehans, of Cape Girardeau, Mo., for claimant Pacific Nat. Fire Ins. Co.

John M. Drane, of Newbern, Tenn., Joe F. Riddle of Tiptonville, Tenn., and Oscar A. Knehans and Jack O. Knehans, both of Cape Girardeau, Mo., for claimants R. H. Eastwood et al.

HULEN, District Judge.

This proceeding, initiated by J. E. Taylor, G. R. Taylor, I. L. Shepard, and Faustina Shepard, as owners of the tugboat "Big Chief", is for limitation of liability under Revised Statutes, Section 4283, 46 U.S.C.A. § 183. Jurisdiction results under the Admiralty Act.

Petitioners operated a ferry across the Mississippi River at Caruthersville. On the night of July 28, 1946, about 9:00 p.m., the ferry consisting of the tugboat "Big Chief" and a barge, collided with a tow, consisting of two tugs, the "Fred B. Zigler" and "Z-Eight," and two oil barges. The tugboat "Big Chief" was sunk, the ferry barge overturned. Lives of eleven passengers on the ferry were lost, while others sustained personal injuries and property damage.

An interim order was made on filing the petition granting the prayer of the petition and appointing L. R. Jones as trustee to receive assignment of petitioners' claim for loss of the "Big Chief" and as Commissioner to hear proof of claims. A monition was issued granting a temporary injunction and fixing date to file. It appears that all parties having any interest in the case have filed their answers and claims. Claimants, referred to as respondents, challenge petitioners' claim to limitation of liability.

The issues are: (1) Have respondents proved any negligence or breach of duty in operation, management and maintenance of the ferry, consisting of the tugboat "Big Chief" and the barge which contributed to cause loss to respondents; (2) If so, have petitioners proved that such negligence or

breach of duty was without knowledge or privity on their part.

By agreement, the record consists of the testimony taken by the Board of Investigation of the United States Coast Guard at the inquiry "into the marine casualty involving the collision between the motor towing vessels Fred B. Zigler and Z-8 and tow, and the motorboat Big Chief, towing vessel with the automobile and passenger barge Interstate Ferry, in tow," and answers to interrogatories.

Charles E. Hendrix was the pilot on the Big Chief. The Big Chief was 36 feet in length, 11 feet in breadth, and licensed as a towboat for a ferry barge. It had lashed on the starboard side the "Interstate Ferry," a barge which was of steel construction, 75 feet in length, 18 feet in breadth, and licensed as a combined vehicle and passenger ferry. The Big Chief was made fast to the barge broadsides, midway the length of the barge. The Zigler tow consisted of two tug boats, the "Fred B. Zigler" and the "Z-Eight," and two oil barges, each 210 feet in length and 40 feet in breadth. The two oil barges were being pushed up the river tandem style. Hendrix testified that his customary manner of crossing the river from the Tennessee side to the Missouri side, at Caruthersville, was on leaving the Tennessee side he headed downstream, and on reaching a point off the Missouri ferry landing he turned and placed the head of the barge toward the Missouri landing. On the last run of the ferry, about 9 p.m. on July 28, 1946, five motor vehicles and twenty-four passengers were taken on at the Tennessee landing. The crew of the ferry consisted of a pilot and one deck-hand. The pilot of the ferry had difficulty getting the ferry under way. For some reason it headed back into the Tennessee bank above the landing and had to be backed off. The evidence indicates that either the barge or the tug went aground. After clearing the landing the ferry started on its customary voyage downstream, intending to make the Missouri landing. The night was dark but there was no fog. The river current was about four miles per hour. The ferry made "3 miles per hour in still water." The pilot testified that when he left the Tennessee

shore he saw the Zigler tow, then about a mile below the landing. He saw the regular red and green lights on the boat and some white lights "around on it." The Zigler tow in the meantime was proceeding up the river near the Missouri shore, after having picked up two men at Caruthersville. The river at this point is approximately 600 yards wide. The pilot of one of the Zigler tugs estimated he was proceeding "about 150 to 200 yards off shore." When the ferry reached the point in the river opposite or slightly below the Missouri landing which was marked with a light, the pilot of the ferry turned the ferry from its course down the river, in the direction of the Missouri shore. The pilot of the Zigler tug saw the ferry when it left the Tennessee landing, and observed its course downstream, which if continued, would have left ample room between the two vessels to pass. The changing of course by the ferry brought the ferry in front of the Zigler tow. The pilot of the ferry did not see the barges in front of the Zigler tugs and thought he had room to pass in front of the Zigler tugs, and only learned of his danger when he had made the turn and the Zigler searchlight was flashed on the ferry and the front of the Zigler tow. The pilot of the ferry speeded up his engine, hoping to escape the tow. The Zigler tugs cut off their power. The boats were then too close to avoid collision. The Zigler tow struck the tug Big Chief amidship, sinking it, then turned over the ferry barge precipitating the passengers and automobiles on it into the water. The evidence is indefinite as to how far the ferry traveled from the Tennessee landing to point of collision. The distance was probably approximately a mile, we conclude.

The pilot of the Zigler tug gave a signal to the ferry pilot soon after the ferry left the Tennessee landing for the ferry to pass the Zigler tow outside or on the starboard side of the Zigler tow. The ferry pilot did not see the signal, or if he saw it he did not understand it. There is no evidence of any other signals having been given by either ship.

The pilot of the ferry operated the engine of the tug from the pilot's cabin, steered the tug and apparently observed the

barge during the crossing as he testified that the cars on the barge were getting ready to get off at the time of the collision. Although it was clear, the night was dark, and in order to make the Missouri landing the pilot of the ferry had to steer for a light on the Missouri side placed at the Missouri landing. Petitioners, in answer to the interrogatory, "Was there a lookout on said ferry boat before said collision, other than the pilot?" answered, "In addition to the pilot on the ferry boat there was a deck-hand on the Interstate Ferry barge, whose duty it was to assist in the operation of said ferry and to assist the pilot in any way which might be necessary or required." The deck-hand on the ferry supervised placing of motor vehicles on the ferry, their order of loading and unloading, handled the mooring lines when docking, as there appears to have been no one else provided to do this work. During the voyage of the ferry his duties included collecting fares from passengers. The record does not show the length of time required for the crossing but it does show that at or just before the collision the deck-hand was engaged in collecting fares from the passengers (see testimony of Frank Whitworth). This witness also testified that when he pulled on the barge he asked the deck-hand for the captain of the boat, and was told that they had no captain on it; "both of our captains are ill".

There was substantial testimony that the barges in the Zigler tow carried red and green lights at the corners of each barge. Nine witnesses testified they saw lights on the Zigler barges. Among the witnesses so testifying as to lights were the two pilots of the tugs and master of the Zigler tow. The deck-hand on the Zigler tow who lit the lights so testified. Hazel Meyers, who was on the ferry, testified that she saw "a green light about middle ways of the barge" shortly before the collision. Two other witnesses testified to seeing lights on the Zigler barges when they were over a mile from the place of the collision.

■ I. Petitioners urge the collision between the ferry and Zigler tow resulted solely from negligence by the operators of the Zigler tow. Petitioners argue the night

was dark, there were no lights on the front end of the Zigler barges and the barges could not be seen from the ferry tug or barge. This position is contrary to the record in this case. The record, while meager and made without benefit of counsel or cross-examination, sustains the burden of proof of respondents that the collision between the ferry and the Zigler tow was contributed to by negligence in the operation of the ferry, in its failure to maintain a lookout in its voyage across the river. It is true the night was dark, but the preponderance of the evidence establishes there were lights on the front end of the Zigler barge that could have been seen had someone on the ferry been keeping a vigilant lookout as required by the rules of navigation. Persons on the shore testified that they saw lights on the Zigler barges at a distance of over a mile. There is no apparent reason why a lookout on the ferry could not have seen as much. The only argument advanced by petitioners to exonerate the ferry from liability is absence of lights on the Zigler barges.

■ The testimony shows plainly how the accident occurred. The pilot of the ferry on leaving the Tennessee dock proceeded downstream, bearing towards the Missouri shore. The pilot of the Zigler tugs saw it and assumed that the ferry's course downstream would be continued and if it did the ferry would pass on the outside, or starboard side, of the Zigler tow. In reaching this conclusion and continuing to act on it until the ferry was in front of it, the Zigler tow was not necessarily free from negligence, but with the negligence of the Zigler tow we are not here concerned except as it might have been the sole cause of the collision. It is undisputed that shortly before the collision the ferry changed its course from downstream and headed towards the Missouri shore and followed that course until the two ships collided. The pilot of the ferry testified he did not see the lights on the barges, or the barges, before he changed direction and that he assumed he had room to turn and cross the bow of the Zigler tugs; that he saw the Zigler barges only when he had made his turn and the

barges were then bearing down on him and it was too late to avoid the accident. A properly posted lookout on the ferry could have avoided the collision—at least we find such an inference to be fair and reasonable from all the facts and circumstances revealed by the record. The lookout would have known the intended course of the ferry from previous crossings and he would have seen the Zigler barges in time to have warned the pilot of the ferry, with the result that the ferry would have continued on its course and passed the tow on its starboard side, or the ferry could have signaled the Zigler tow of its intended turn and desire to proceed ahead of the Zigler tow in time to have governed itself by the conduct of the Zigler tow.

■■ There is an intimation in petitioners' brief that the ferry was the privileged vessel and the Zigler tow the burdened vessel. Under the facts in this case that would not dispense with the necessity of a lookout nor indicate that the lookout would have been powerless to have avoided the accident, nor justify the ferry proceeding across the bow of the Zigler tow if to do so would subject the ferry to danger. As was said in Postal S. S. Corp. v. El Isleo, 308 U.S. 378, loc. cit. 387, 60 S.Ct. 332, 336, 84 L.Ed. 335:

"The so-called privileged vessel has no absolute right to keep her course and speed regardless of the danger involved in that action. Her right to maintain her privilege ends when there is danger of collision and in the presence of that danger both vessels must be 'stopped and backed if necessary, until signals for passing with safety are made and understood' ".

II. The vital question in this case results from petitioners' request for limitation of liability based on petitioners' claim that negligence or breach of duty resulting in the loss from the collision of the two vessels was without knowledge or privity on their part. We pass to that issue.

■ The law is plain that the burden of proof rests upon the respondents to establish liability based on negligence in the operation, management and maintenance of the ferry tug and barge. This respondents have done. The burden then rests on peti-

tioners to establish that such negligence or breach of duty was without knowledge or privity on their part. See The Linseed King, D.C., 24 F.2d 967. Have petitioners sustained their burden of proof?

■■ Petitioners in the operation of the ferry at Caruthersville engaged in carrying passengers for hire are held to a high degree of care. That responsibility is not to be measured, as petitioners urge, by conditions such as prevail "along these western rivers." What might constitute the exercise of proper care on the part of ferry operators across the Niangua, at a place where it is free of all other river traffic, would not apply to the operation of a ferry across the Mississippi River at Caruthersville. The petitioners' ferry was operating at a point where "a lot of boats pass" (see testimony of witness Pitts). The rule is stated in Henson v. Fidelity & Columbia Trust Co., 6 Cir., 68 F.2d 144, 145, as follows:

"It has been said that the care which a carrier owes his passengers is 'to observe the utmost caution characteristic of very careful, prudent men' (Pennsylvania Co. v. Roy, 102 U.S. 451, 456, 26 L.Ed. 141), which is 'the exercise of the utmost human skill and foresight' (Chesapeake & O. R. Co. v. Morgan, 129 Ky. 731, 112 S.W. 859, 860), or, as was said by this court in Pennsylvania Co. v. Clark, 6 Cir., 266 F. 182, 188, 'the exercise upon the carrier's part of extraordinary vigilance, aided by the highest skill,' or the 'greatest and highest degree of care and caution approved by human knowledge and experience and consistent with the nature, extent and operation of its business.' Memphis Street Railway Co. v. Bobo, 6 Cir., 232 F. 708, 711. See, also, Giger v. New York [N.] H. & H. R. Co. 2 Cir., 60 F.2d 63; Lehigh Valley Railroad Co. v. Ciechowski, 2 Cir., 10 F.2d 82."

The Henson case was presented on a petition for limitation of liability arising from death of passengers on a ferry across a river.

■ Petitioners' right to limitation of liability turns on the question of sufficiency of the crew furnished for the ferry. Petitioners as owners and operators of the ferry carrying passengers had a duty not

only to provide a seaworthy vessel but they must also provide the vessel with a crew. adequate in number with reference to all exigencies of the intended route. They are " * * * bound to exercise the utmost care in these particulars,—such care as the most prudent and careful men exercise in their own matters under similar circumstances; and if, by reason of any fault or neglect in these particulars, a loss occurs, it is with his privity, within the meaning of the act." See In re Meyer, D.C., 74 F. 881, loc. cit. 885.

See also The Bessie J. D.C., 268 F. 66.

■ The basic issue is, did petitioners meet the duty the law imposed upon them, in furnishing a crew consisting of pilot and one deck-hand, in the operation of the ferry. We are not concerned with whether petitioners furnished a pilot or a deck-hand, but did the petitioners furnish a crew including (or out of which could be provided) a lookout. It is a primary rule of navigation that all moving vessels shall maintain a careful and efficient lookout. He is considered both the eyes and ears of the ship. Of course he must be properly stationed, usually on the forward part of the vessel, and is held to a high degree of diligence in that position. See Dahlmer v. Bay State Dredging & Contracting Co., 1 Cir., 26 F.2d 603; Inland Rules, art. 29, 33 U.S.C.A. § 221; The Sagamore, 1 Cir., 247 F. 743; The Ariadne, 13 Wall. 475, 478, 20 L.Ed. 542; The Oregon, 158 U.S. 186, 193, 194, 15 S.Ct. 804, 39 L.Ed. 943; Delaware, L. & W. R. Co. v. Central R. Co. of New Jersey, 2 Cir., 238 F. 560, 562; The Genesee Chief, 12 How. 443, 463, 13 L.Ed. 1058. Not only does the rule with respect to lookouts apply to ferries, but "more than ordinary care, vigilance, and caution are required on their part." See Eastern Dredging Co. v. Winnisimmet Co., 1 Cir., 162 F. 860, 861, where the Court said:

"The Supreme Court has been constantly rigid in holding vessels to maintaining lookouts as far forward and as near the water as possible. Especially where the water is dark, with otherwise a fairly clear night, it is important that the lookout should be as near it as possible, in order that his eye may follow the surface, and thus be in position to detect anything low down which may be approaching. While it may be true that there was no occasion to anticipate that a mud scow would be adrift in the harbor, without lights and without being manned, at that time of the night, various very small crafts, including even rowboats, were to be guarded against as a matter of reasonable and ordinary precaution. *Whatever may be the custom with reference to ordinary ferryboats plying across a harbor like that of Boston, the law is even more strict with them than with ordinary seagoing vessels.* Marsden on Collisions (5th Ed.) p. 383, refers to the fact that, *while public convenience requires ferryboats to be running when other vessels may not be permitted to run, 'more than ordinary care, vigilance, and caution are required'* on their part; and again, at page 468, the learned author observes:

"'*The duty of ferryboats, and of vessels crossing the track of ferryboats, to keep a specially good lookout, has been insisted upon in many cases.*'" (Emphasis added.)

■ Petitioners did not furnish any lookout as such for the ferry on the crossing that resulted in the death of eleven passengers. In answer to an interrogatory on the subject they stated that in addition to the "pilot" there was a "deck-hand." It is not claimed, and there is no evidence, either of these employees had the duty to perform of a lookout. Petitioners' argument in effect concedes the rule requiring them to see that the barge and tug comprising the ferry were at all times properly manned, and further that the ferry was required to have a lookout on the occasion in question. They want a ruling they met the norm of care required of them by furnishing a crew of two for the ferry. They argue "it is common knowledge that ferryboats along these western rivers never have any more than one or two in the crew." We have no such knowledge—but we are here concerned with a particular ferry operating at Caruthersville. By that operation, or operations under like or similar conditions, the conduct of the petitioners must be judged. It is further urged by petitioners that a deck-hand on a small ferry-

boat "has no duties whatever to perform when the ferry is on voyage, *except to assist the pilot in the management and operation of the ferry.*" Management and operation of a ferry can include a great many things. It can include supervision of the cars while on the ferry, making ready the mooring lines for docking, to mention only two. But absent assumptions, and for the financial interest of the petitioners, the deck-hand was required to and did engage in collecting fares while the ferry was on its voyage. The time required for that work would depend on the number of passengers. On the ferry's last voyage there were twenty-four passengers. How long this work would take we do not know. No effort was made by petitioners to show—but the deckhand was collecting fares at or just prior to the time of the collision between the ferry and Zigler tow. (See testimony of witness Whitworth.) We conclude a reasonable and fair conclusion to be drawn from the record is that the deckhand could not perform the duties of a lookout, as required by law, and also the other duties required of him. We are unable to agree with petitioners that they met their legal duty by furnishing a deckhand who could be assigned to the duties of a lookout if he were relieved of other necessary duties. There was no one else to perform the other necessary duties. We will not presume the operators of the ferry expected the deckhand to be relieved of duty of collecting fares from passengers with no one else to do that work.

There is no claim by petitioners that the pilot answered the requirement of a lookout. His duties not only called for piloting the ship, operating steering apparatus, but he also was required to operate the engine of the tug. He must keep his tow under observation. He must steer for the light on the opposite shore marking the Missouri landing of the ferry. It was doubtless his concentration on the performance of these duties that prevented him from seeing the signal from the Zigler tow, or the lights on the barges of the Zigler tow. These facts illustrate the reasonableness of the rule that "neither the captain nor the helmsman in the pilot house can be considered to be 'lookouts' within the meaning of the maritime law." Dahlmer v. Bay State Dredging & Contracting Co., supra [26 F.2d 605].

Finally, petitioners would free themselves from liability on the premise that "if the owners provide a sufficient number of men to operate their vessel then they have fulfilled their duties and if there was some neglect on the part of such persons so selected" then such negligence was that of the ship, not of the owners. That is the law. But this is not a case where the owners furnished a sufficient crew to provide for a lookout, and the master assigned the lookout to other work inconsistent with his duties as lookout. Here only one deckhand was furnished in addition to the pilot. The owners of the ferry lived in the vicinity of the ferry. One owner, Mr. J. E. Taylor, testified that he operated the ferry. The owners of the ferry, certainly the one operating the ferry, must have known of the arrangement of the barge and the tug and how the ferry was operated as to route, hours of operation after dark, surrounding conditions, presence of shipping in the Mississippi River off Caruthersville; that a deckhand engaged in collecting fares would be engaged for at least a portion of the voyage in that work and not free to act as a lookout; that there was only one man on the barge and tug to do the work to be performed on the barge, including the keeping of a viligant lookout at all times during the voyage. We find a fair and reasonable conclusion to be drawn from the facts and circumstances of this case is that the owners must have known one deckhand could not perform all the duties reasonably expected of him on the barge, and at the same time keep a vigilant lookout. In the case of The George W. Roby, 6 Cir., 111 F. 601, loc. cit. 614, the Court said:

"But it was the duty of the master, and not that of the owners, to see that a competent lookout was always on duty. If the master chose to assign to the lookout a duty which took him from his station or divided his attention, how could the owners prevent it? *A case might be made against the owners if it was shown that they were privy to such an act of negligence, or that*

*they knew that the master was in the practice of keeping no lookout, or of requiring other duties inconsistent with the watchfulness and undivided vigilance constantly due from a lookout."* (Emphasis added)

See also The Bessie J., supra.

See Rule 26, "Pilot Rules for Western Rivers":

"Nothing in these rules shall exonerate any ship, or the owner, or master, or crew thereof, from the consequences of any neglect to carry lights or signals, *or of any neglect to keep a proper lookout,* or of the neglect of any precaution which may be required by the ordinary practice of seamen or by the special circumstances of the case." (Emphasis added.)

We find respondents have carried their burden of proof, that the ferry, consisting of the tugboat Big Chief and barge Interstate Ferry, was negligent in not having a lookout in the proper place to meet the demands which the rules of navigation made on her, and that the failure to have such lookout was a contributing cause to the collision between the ferry and the Zigler tow; that the petitioners have failed to carry the burden of proof that they had no knowledge or were not privy to such negligence; we find that the petitioners did not exercise due care in failing to furnish a sufficient crew to provide for a lookout in the usual and customary operations of the ferry, and that the failure of the petitioners to furnish an adequate crew for the operation of the ferry, including a lookout, was negligence upon their part, and that such negligence was a contributing cause to the loss for which respondents are seeking compensation.

III. Respondents argue that petitioners are not in a position to seek limitation of liability for failure to surrender the barge which was lashed to the tug Big Chief at the time of the collision. They insist that the barge must be surrendered along with the tug as a condition precedent to limitation of liability. See Sec. 4285, R.S., Tit. 46 U.S.C.A. § 185; The Ioannis P. Goulandris, 2 Cir., 140 F.2d 780; The Columbia, 9 Cir., 73 F. 226; Sacramento Navigation Co. v. Salz, 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663.

It is our opinion that the tug and barge constituted one vessel, in the operation of a ferry. It was not possible to operate the ferry without the barge. The barge should have been surrendered but we do not find it necessary to determine the effect of the failure to surrender it nor whether it may still be surrendered because of our view that on the merits the decree will be for the respondents on petitioners' plea for limitation of liability.

Let findings of fact, conclusions of law and appropriate order be submitted.